WILLIAM FONTAIN, ADMINISTRATOR *de bonis non cum testamento annexo* OF FREDERICK KOHNE, DECEASED, APPELLANT *v.* WILLIAM RAVENEL.

A resident in Pennsylvania made his will, in 1829, giving annuities to his wife and others, and directing that his executors, or the survivor of them, after the decease of his wife, should provide for the annuitants, then living, and dispose of the residue of his property for the use of such charitable institutions in Pennsylvania and South Carolina as they or he may deem most beneficial to mankind.

His wife and three other persons were appointed executors.

The three other persons all died during the lifetime of the wife. No appointment of the charity was made or attempted to be made during the lifetime of the executors.

The charity cannot now be carried out.

The exe-utors were vested with a mere power of appointment without having any special trust attached to it. In England, the case could only be reached by the prerogative power of the crown acting through the sign-manual of the king.

The English and American cases upon this subject examined.

THIS was an appeal from the circuit court of the United States for the eastern district of Pennsylvania.

It was a bill filed by Fontain, as administrator *de bonis non cum testamento annexo* of Frederick Kohne, deceased, against Ravenel, one of the executors of Mrs. Kohne, the widow of the deceased Frederick. The object of the bill was to recover from the defendant certain sums of money which came into the hands of the widow, as executrix of her husband, for the purpose of applying them to some charitable bequests made in the will of Frederick Kohne. These are stated, as well as the other circumstances of the case, in the opinion of the court, and need not be repeated.

The circuit court dismissed the bill, and the complainant appealed to this court.

The case was argued, in print, by *Mr. Hopper* and *Mr. Meredith*, for the appellant, and by *Mr. Gerhard* and *Mr. Pettigru*, (with whom was *Mr. Whaley*, for the residuary legatee of Mrs. Kohne,) for the appellee.

The following were the points and authorities relied upon by the counsel for the appellant, in their original brief. An elaborate reply was filed by the counsel for the appellee, and then a rejoinder by the appellant's counsel. The reporter feels it difficult, with this quantity of matter, to present a fair view of the arguments without protracting the report to an unreasonable length.

Points and authorities for appellant.

*As to domicile.* An intention to make a place his home, will determine the domicile. Grier *v.* O'Daniel, 1 Binn.; see opinion of Judge Rush, in a note, p. 351.

If the surviving executrix has rightfully distributed among the next of kin, nothing more is to be said. If not, the administratrix *cum testamento annexo*, is entitled. Row *v.* Dawson, 1 Ves. 331; Ferran's Estate, 1 Ashmead, 319; Marshall *v.* Hoff, 1 Watts, 440; Act, 1834; Executors and Administrators, Dunlap's Penn. Digest, 524. The property here is held to abide the event of this suit.

The right of the administrator *de bonis non* is exclusive. Commonwealth *v.* Strohecker, opinion of Kennedy, J., 9 Watts, 480.

Will took effect in 1829, by which the personal estate became vested in the executors, and by reason of the power of sale in the will and our act of assembly, March 31, 1792, § 4, (3 Smith's Laws, 67,) the title to the real estate became vested in them upon the trusts of the will; that is, to pay the legacies and annuities and invest for accumulation the surplus until the death of the widow, and then to distribute the surplus in charity.

The descent was broken. Silverthorn *v.* McKinster, 2 Jones, 72.

The administrator *de bonis non cum testamento annexo* is empowered to sell the real estate, the same as the executors. Act of 24th February, 1834, § 13, (67 Dunlap, 518, 530,) and Act of 12th March, 1800, § 3, (3 Smith, 434;) Mr. Binney's opinion, Hood on Executors, 241.

The objects are not very extensive or difficult of ascertainment. They are incorporated institutions of the two States for the purposes of charity; some of which are for the relief of colored people, and do not include beneficial societies. Blenon's Estate, Brightly, 340.

It is a settled principle that a trust shall never fail for want of

a trustee. And the courts of equity will take upon themselves the execution of the trust. 2 Story's Eq. § 1059, 1061, 1191.

The administrator with the will annexed is the trustee for the settlement of the estate, and under the direction of the orphans' court, the trust can be executed by him. He will have the personalty, &c., and can sell and get proceeds of the realty. This power is in the orphans' court. Act 1832, § 4, Wimmer's Appeal, 1 Whart. 103, 104.

The personalty is under control of that court, (orphans' court,) and the moneys may be paid into that court for the uses of the will. Act 34, § 19. It was so done in Tilghman's Estate, 5 Wheat. 44.

These provisions meet ordinary cases.

But here as in England the courts will go further in favor of charities, than in ordinary cases. Our law favors charitable uses. Constitution of Penn. 1776 and of 1790; Girard Will case, 177; Acts 1730, 1731; Purd. 1010; 7 Sm. Laws, 43, 44.

Had the executors refused, they could have been compelled to execute the trust. It should not be lost by accident. Poll's Petition, 1 Ashmead, 346. See Welford Eq. Pleading, 110, Lib. Law and Eq., as to information of attorney-general.

The court will assume the exercise of the discretion to ascertain the objects, where they are much less defined than here, and where the executor intrusted, died in the lifetime of the testator. Boyle on Charities, 220; Bax v. Whitbread, 16 Ves. 15, see 26, 27; Cole v. Wade, 16 Ves. 43; Brown v. Higgs, 8 Ves. 570; See Moggridge and Thackwell, 1 Ves. 464; 7 Ves. 36; Affirmed, 13 Ves. 416.

The court could regulate and control the exercise of the discretion by the executor; and if so, when he cannot exercise it all, may it not do so for him? Grandom's Estate, 6 Watts & S. 551; Waldo v. Caley, 16 Ves. 210, 211.

Here the objects have not failed, and there is no occasion to resort to the doctrine of *cy pres*, or the royal prerogative.

The only question is, whether the court or administrator can select from the designated objects. If either can, then the trust is to be executed as if the executors had lived; or if either cannot, then all the charitable institutions incorporated by the two States must take.

In White v. White, 1 Bro. Ch. Cases, 12, the testator bequeathed to the Lying-in Hospital, and if more than one, to such of them as the executor should appoint; and named no executor. The court is to appoint.

A bequest to a charitable school to purchase Bibles, Testaments; and other religious books, held not too indefinite. This directed a religious purpose which was sufficiently certain. Attorney-General v. Stepney, 10 Ves. 27.

So here there is at least a definite purpose as to objects in respect to the colored population, besides the definitiveness of the charitable institutions of Pennsylvania and South Carolina, which define the objects to be the purposes for which these institutions have been established. Orphan Asylum *v.* McCartee, 9 Cowen, 440; King *v.* Woodhull, 2 Edw's Ch. R. 87.

A bequest is good where it is made to a class, as of such a parent, or to such of them and in such shares as an executor may appoint. Bartlett *v.* King, 12 Mass. 541; Brown *v.* Higgs, 8 Ves. 570, 574. It is not the case of a mere power, but of a trust accompanied by a power. In such case the trust is imperative and may be enforced; and is not lost by the refusal of the trustee to exercise his power, or by his death. 2 Sugden on Powers, 173, 175, &c.

There is nothing in the will that looks to the charity ending upon any condition or contingency. The will gives not the property over on any event.

He gives to the next of kin all that he intends they shall have, and means that they shall get no more.

As our law stood in 1829, the executor of the surviving executor would have taken the personalty, and administered it, or an administrator with the will annexed would have done so, and also have exercised the power to sell the lands and administer the proceeds. Act 1800, 3 Sm. Laws, 434, § 3.

The testator is presumed to have known the law of the place where the will was to be executed, and he is presumed to have known, that the law provided a substitute for his executors, to carry out the trust.

There was no condition, the breach of which would give the property to the next of kin, as in Porter's case, 1 Co. 21.

It was a trust and confidence, which the court will carry out if the trustee fails, as in Martindale *v.* Martin, 7 Vermont, 291; Cro. Eliz. 288.

And not only a trust, but a charity, "which never faileth;" and not vague or indefinite, or to unincorporated societies.

In Martindale *v.* Martin, or Thetford School case, the executors refused the trusts, but it was held binding on them. See 7 Vermont, 298, 299.

If the intention to give to charity be declared absolutely, and nothing is left uncertain but the mode of carrying it into effect, the court will supply the mode. Mills and Farmer, 1 Meriv. 54, 94, 101, 102.

Thus in that case the testator directed the residue to be divided for certain charitable purposes mentioned, " and other charitable purposes as I do intend to name hereafter," and afterwards named no further purposes. Held, a disposition in favor

of charity, to be carried into execution by the court, having regard to the objects particularly pointed out by the will. Ib. 54.

There the objects pointed out were the promoting of the gospel in foreign parts, and the bringing up ministers in different seminaries in England.

Here all the objects are pointed out, to wit: the charitable institutions of the two States, so as to include a benefit to part of the black population. Here is nothing to be supplied, but a leave given to select some only of those institutions.

Bequests made to two corporate bodies, for the relief of certain classes of poor persons, by paying their rents, and giving them gratuities according to selection. The societies renounce the legacies. Yet held that the discretion of the trustees was not of the essence of the trust, and that the court would carry the trust into effect by a scheme. Reeve *v.* Attorney-General, 3 Hare, 191.

Where bequests are made to trustees for general charitable purposes, the trust must be the subject of a scheme before the master; but where the object is a charity without a trust interposed, the disposition is in the crown, and must be made according to the directions under the royal sign-manual. Paice *v.* Archbishop of Canterbury, 14 Ves. 364, 371, 372.

This is not a case that in England would come under the king's sign-manual, but within the jurisdiction of chancery, as a trust. It does not depend upon the crown prerogative for its execution, but upon the law of the land. Boyle on Charities, ch. 14, p. 237, &c.

1827. In Pennsylvania, the law is settled in favor of charities far enough to sustain the present bequests.

In Witman v. Lex, 17 Serg. and Rawle, 91, 92, it was decided that all that was contained in 43 Eliz., and more, was contained in the common law of Pennsylvania, though it was not then supposed, as afterwards found in the case of Sarah Zane's will, and of Vidal *v.* Girard's Executors, that at the common law of England, the same breadth of law existed in favor of charity.

And the cases are there cited as authoritative here, where there was no trustee to take, but the court decreed the bequest a devise to corporations for the charitable objects pointed out. Ib. 92.

It is there said that so much more liberal is our system in favor of bequests, though not strictly charitable, that our courts would have found no difficulty in ruling in favor of the legatee. Ib. 93; Morice *v.* Bishop of Durham, 9 Ves. 399.

The bequest in 9 Ves. was for benevolent, not charitable

purposes. Here, it is for charitable purposes only; for it is to go to charitable institutions for the purposes of their creation.

1829. In McGirr v. Aaron, 1 Pa. 49, there was no trustee at all that could take for the purpose of charity, but the devise was sustained and to become vested as soon as the charity should acquire a capacity to take.

Here there was a trustee until all the executors died, and the administrator *de bonis non cum testamento annexo* is the substituted trustee.

In the same year, the United States supreme court, in Beatty v. Kurtz, sustained the dedication of a lot for the Lutheran church in Georgetown, without any deed, grantee, or trustee. 2 Pet. 566–583. And a committee of the congregation was held sufficient to maintain the bill. 584.

A trust may be created by will, to bind the title of the heir or personal representative, and make him a trustee where no other is named. Inglis v. Sailor's Snug Harbor, 3 Pet. 119.

But here were trustees named, and trustees who had no object to defeat the trust, though they had a selection within a limited range. Ib. Also, Malim v. Keighley, 2 Ves. Jr. 335.

1832. A trust in favor of an unincorporated religious society is an available one. Meth. Ch. v. Remington, 1 Watts, 218.

1833. The case of Maguire v. Brown, so elaborately decided by Judge Baldwin, covers all this case. Brightly, 346.

Devises and bequests to unincorporated meetings of Friends were held good; for the relief of poor members; of the Indians; inclosing a graveyard; purchasing a fire apparatus.

Charities are left free for the exercise of the jurisdiction of the courts, according to the intention of the testator, disregarding defects of form or designation of a party to take, and a devise to the church is transferred to the parson where the church cannot take in mortmain. Or if it be to the poor who cannot take, then to their hospital which could, as in McGirr v. Aaron, from the priest, who could not take, to the congregation, when authorized. Brightly, 386.

The cases in which these principles were applied were before the 43 Eliz. on prior statutes or the common law. Ib. 387, 393.

Though there be none to take the heir and next of kin are bound. Ib. 407.

The administrator *cum testamento annexo* is the trustee, and this court will make the distribution to the legatees. Ib. 408, 409.

1836. Martin v. McCord was decided in the supreme court of Pennsylvania. Charities are sustained. 5 Watts, 495.

1843. A devise to an association for religious purposes, unincorporated at the testator's death, but since incorporated, is good in Pennsylvania. Zimmerman and Anders, 6 Watts & S. 218.

1844. In Vidal v. The City, 2 How. 127, it was held that

although the corporation had been incompetent to take, the heir could not take advantage of such inability, but the State only in its sovereign capacity.

At the common law of England and in Pennsylvania, such a trust would be sustained without a trustee.   2 How. 192.   See cases in Binney's Argument, Girard Will case, 80.

We are neither dependent upon the Stat. 43 Eliz., or the common law prerogative, to sustain such a charity. 2 How. 195.

And general and undefined charities were sustained before the Statute 43 Eliz., by the inherent power of chancery, at common law.   Ib. 196.

And the law of the preceding cases is the law of South Carolina.   Attorney-General *v.* Jolly, 1 Richardson, Eq. Rep. 99.

1848.   Beaver *v.* Filson, 8 Barr, 327, 335.   A lot dedicated for a church and graveyard, without deed or trustee, held a valid charitable use.   Wright and Linn, 9 Barr, 435–437.

1850.   Where a tenant for life has power of disposition by will, with two subscribing witnesses, and disposes by will to a charity, without witnesses, the devise will be sustained in favor of charity, though it would not in favor of an individual not for charity.   Pepper's Will, 1 Parsons's Eq. Cases, 433, 450, 451.

Other States.   4 Kent's Com. 6th ed. 509, note.   Where there is a trust for charitable purposes, the disposition is in chancery, and not by the king, under sign-manual.

The power to enforce charities is in the court of chancery, by virtue of the original constitution, independent of the statute of 43 Eliz.   Wright *v.* Trustees Meth. Ep. Ch. 1 Hoff. Ch. R. (N. Y.) 202, 260; Dutch Ch. *v.* Mott, 7 Paige's Ch. R. (N. Y.) 77; Burr *v.* Smith, 7 Verm. 241, 294, 298, 306, 307, (cites Attorney-General *v.* Hickman, where trustee died before testator,) 308; King *v.* Woodhull, 3 Edw. Ch. R. 79.

The jurisdiction rests upon the ground that such charities are trusts.   1 Sandf. Ch. R. 439.

Trusts for charitable uses are favored by courts of equity, and will be supported in the exercise of the extraordinary jurisdiction of the chancellor, where the trust would fail for uncertainty were it not a charity.

The trust will be sustained, though there be no person in being capable of suing for the enforcement of the trust.   Dickson *v.* Montgomery, 1 Swan's R. (Tenn.) 348.

The counsel for the appellee made the following points:—

I. What is the law of ordinary or private trusts, and its difference from that of charitable trusts?

II. The *cy pres* doctrine of the English chancery; and in connection herewith, the impossibility of executing this trust as a

charity, in any other way than by an application of the property under the sign-manual; and, incidentally, it will be inquired, whether this trust is a charity within the statute of 43 Eliz., which statute defines the charities of the English law, though it did not originate the doctrines of charities, as recognized by that system of jurisprudence.

III. That the *cy pres* doctrine of the English court of chancery, has not been adopted in Pennsylvania, South Carolina, or the other States of the Union, either as a part of the common law or as an inherent power of a court of equity; and herein of the law of charitable trusts in the United States generally, but particularly in the States of Pennsylvania and South Carolina, and the whole of the difference between that law and the doctrine of private trusts; and incidentally, the impossibility of sustaining the case of the plaintiff under the law of charitable or private trusts in the United States, and particularly in either of the States just mentioned; or in any other way than under the *cy pres* doctrine.

IV. That the doctrine of powers, or the Pennsylvania statutes in relation to executors and administrators, are entirely inapplicable to the present case.

V. That if a bequest or devise, like the present, fails or becomes void, it is like an ordinary lapsed legacy, and the next of kin or heirs at law will take the bequest or devise.

(After discussing these points at great length, the counsel concluded their argument with the following reply to the points made on the other side) : —

Finally : It was intended to give here an answer, at length, to each of the positions of the appellant; but as we have endeavored to reply fully to his points in the preceding argument, we shall do little more now, than make references to such parts of our argument as answer these points respectively. The arrangement of the argument of our learned opponents was substantially as follows : —

1. That Philadelphia was Mr. Kohne's domicile.

2. That an administrator, *de bonis non cum testamento annexo,* is clothed with the same trusts, and bound by the same duties as the executors, even as to a power of sale of the real estate.

3. That the residuary bequest and devise in Mr. Kohne's will is a trust, and for a charity.; and the courts will go further to sustain this species of trust than any other, and will not suffer it to fail for want of a trustee, particularly where there is no uncertainty in the objects, as in the present case; those objects (which are assumed to be the incorporated institutions of the two States) not being, as they assert, very extensive or difficult of ascertainment.

4. That the law of Pennsylvania favors charities.

5. That by the common law of England and Pennsylvania, such a trust would be sustained without a trustee.

6. That the power to enforce charities is inherent in courts of chancery independently of the statute of 43 Eliz., and without the aid of the royal prerogative.

1. That Philadelphia was Mr. Kohne's domicile.

We have submitted that, in point of fact, that domicile was South Carolina; but we have presented the case under the law both of Pennsylvania and South Carolina, and as the law of these two States does not differ, in regard to the matters material to this case, the question of domicile is of no importance.

2. That an administrator *de bonis non cum testamento annexo* is clothed with the same trusts, and obliged by the same duties, as the executors; even as to a power of sale of the real estate.

No part of this proposition can be sustained, except its last clause, which is acknowledged to be the law of Pennsylvania; and we submit that it follows from the maxim *expressio unius exceptio alterius*, that in Pennsylvania, such an administrator has no powers other than the ordinary ones of an administrator, except as to the sale of real estate in the instances provided for in the acts of assembly. The distinction between the power of reducing property to money, and its distribution according to the discretion of certain specified friends of the testator, whom he names as executors of his will, is too obvious and conclusive to require any comment.

3. That the residuary bequest and devise in Mr. Kohne's will is a trust, and for a charity; and the courts will go further to sustain this than any other trusts, and will not suffer it to fail for want of a trustee, particularly where there is no uncertainty in the objects, as in the present case, those objects (which are assumed to be the incorporated institutions of the two States) not being very extensive or difficult of ascertainment.

We have here grouped together, as we find them in the argument of the appellant, a number of positions, some of which are immaterial, and others are answered in the preceding argument. The points here mentioned may be classified as follows:—

1. The law of charities in Pennsylvania.

2. The assertion that the appellee denies the existence of a trust as to Mr. Kohne's residuary estate.

3. An effort to sustain the appellant's claim under the law of powers, alleging that this is the case of a power coupled with an interest, and that such a power is a trust, and will be enforced in equity.

32*

.1. The law of charities in Pennsylvania.

This subject has been fully discussed, and the law of charity in Pennsylvania stated to its fullest extent, but we have been unable to discover in this law any thing to support the appellant's claim. It is granted that a charitable bequest will not be allowed to fail in that State from the mere want of a trustee; and it is admitted, that the courts of Pennsylvania, would control the discretion of trustees, so far as to prevent them from abusing a confidence placed in them for one class of objects, by exercising that discretion in favor of another and entirely different class of objects, provided that confidence has been so definitely given as to allow such restraint. But how can it be urged that hence it follows that those courts can act for such trustees, when they do not act? It is submitted that we have affirmatively shown the contrary of this proposition; and we again negative the assertion that those courts will themselves assume the exercise of a discretion in the application of property so uncertain as to the beneficiaries, as the designed application of Mr. Kohne's residuary estate.

2. The assertion that the appellee denies the existence of a trust as to Mr. Kohne's residuary estate, is a misapprehension. We do not deny its original existence for the purposes pointed out in the will; and we argue, that it now exists as a resulting trust for the next of kin and heirs of Mr. Kohne.

3. The effort to sustain the appellant's case under the law of powers, is already fully answered in our argument.

4. That the law of Pennsylvania favors charities.

This is true; and the extent to which its laws go to effect this object, has been clearly shown; but this will not be sufficient for the appellant, especially when the supreme court of that State has declared that the principle for which the appellant contends is " too grossly revolting to the public sense of justice to be tolerated " in this country. Methodist Church *v.* Remington, 1 Watts, R. 226.

5. That by the common law of England and Pennsylvania, such a trust would be sustained without a trustee.

This is entirely opposed to all the authorities. The counsel for the appellant, as to this point, relies upon the precedents under the law of ordinary trusts, and these we have shown to be entirely inapplicable. We cannot add any thing to our remarks on this point, nor can we conceive it necessary to speak further on this topic.

6. That the powers to enforce charities is inherent in courts of chancery, independently of the statute of 43 Eliz., and without the aid of the royal prerogative.

This proposition is not maintainable. The appellant's counsel have cited in support of this point, Burr *v.* Smith, 7 Verm.

R. 241. But the law of Vermont cannot govern, or even influence the decision of the present question; and besides, the point decided in that case was merely that a charitable devise or bequest to an unincorporated association is valid; which has been repeatedly held in Pennsylvania, and probably is the law of South Carolina; and though there is nothing in the opinion given in favor of that decision to sustain the appellant's claim, yet even that opinion it is expressly stated was not adopted by any other judge.

Our opponents have likewise adduced on this head a mere dictum, in a note to the sixth ed. of Kent's Com. 4 Kent's Com. 509, n. " In this country, the legislature or government of the State, as *parens patriæ*, has the right to enforce all charities of a public nature, by virtue of its general superintending power over the public interest, where no other person is intrusted with it." As this sentence follows the adoption by the author of the opinion of Judge Story, in the Baptist Association *v.* Hart's Executors, 3 Pet. R. 484, Appendix, it could not have been intended to state any principle inconsistent with the ruling of this court in that case, and still less with any doctrine of interest to the appellee, in the present discussion. The author plainly refers to the right of visitation of public charities, and correctly states the law in regard to that right.

The latter part of the citation, indeed, states one of our positions in the strongest language. " The jurisdiction vested by the statute of Eliz. over charitable uses, is said to be personally in the chancellor, and does not belong to his ordinary or extraordinary jurisdiction in chancery." This proposition would by itself constitute a flat bar to the appellant's recovery.

All the other authorities relied on by the appellant's counsel, whether under this or the other heads of his argument, we do not consider of importance in support of the appellant's bill. The case of Vidal *v.* Girard's Executors, 2 How. 127, is not excepted from this remark; the appellant's counsel have in vain sought to obtain from it any thing in support of their bill, as will be seen by a reference to their argument. This is, however, the most convenient place for us to acknowledge the great assistance we have received from that case, in the investigation of the law of charities. We might add, also, that the case of the executors of McDonogh *v.* Murdoch, 15 How. 367, has been most carefully and minutely examined, but without obtaining from it any thing at all pertinent to the present investigation.

Although this report is already protracted to an unusual length, it is proper to state the notice which the counsel for the appellant took of some of the preceding points.

They were noticed as follows:—

3. This disposition for the benefit of charitable institutions, was a lawful disposition, and one which would be supported by the courts in England and Pennsylvania, and, it is believed, in South Carolina. The difficulty in treating questions of this kind is in avoiding a tedious repetition of things already familiar to the court. Since the decision of Vidal v. The City, 2 How. 127, the principle may be considered perfectly established, which never could have been a matter of doubt with any one who had critically examined the early precedents, that the statute of Elizabeth neither created nor enlarged the rule governing charitable bequests. The statute itself does not purport to have done so, but merely to give an additional remedy. And it was established, in the case referred to, that, from the earliest times, chancery had, in an unbroken course of precedents, constantly exercised jurisdiction over charities, and had supported them. It is enough to say that such a gift as this is perfectly valid; for which we refer to the cases stated in the original brief of the appellant, and in the brief of the appellee. The court will understand how far this principle is carried out in Pennsylvania, by what is said in Witman v. Lex, 17 S. & R. 93, that our courts would have found no difficulty in ruling in favor of the legatee in Morice v. Durham, 9 Ves. 399. There, the bequest was for the purposes of benevolence and liberality. In Beaver v. Filson, 8 Barr, 327, it is said: " In Pennsylvania, religious and charitable institutions have always been favored, without respect to forms, and it is immaterial how vague and uncertain the object may be, provided there be a discretionary power vested somewhere over the application of the testator's bounty to these objects." It is utterly impossible seriously to deny that this bequest is just as good in Pennsylvania as it would be in England, and that it is perfectly valid in both.

4. We take it to be equally clear, that this is a case in which, in England, the court would itself superintend the proper application of the fund, and that it is not a case in which the crown, as *parens patriæ*, would administer it. And it is a case in which the courts of Pennsylvania, we contend, would have ample power to prevent a failure of the trust. It is nothing to say that, in England, the chancellor, in administering charities, acts as the delegate of the crown, inasmuch as he discharges all his judicial functions in that capacity; the theory of the British constitution being, (as the practice originally was,) that the king administers all the justice of the country, and emphatically is this the case with that portion that is administered in the court of chancery. But we are not to conclude that the courts of this country have no jurisdiction over charities, because in England the king is said to have a general superin-

tending power over them. The question here is, whether, in this case, the court of chancery would superintend the execution of the trust. We conceive it to be so clear that it would, that we do not think it necessary to enter on the argument that, even if the disposition in this case would belong to the crown, the State here would have the prerogative of the *parens patriæ*. See 2 Story's Eq. § 1190; Wright v. Methodist Church, 1 Hoff. Ch. R. 202; Going v. Emery, 16 Pick. 107; 2 Kent, (5th ed.) 288, note a; 4 Ib. 508, note b; King v. Woodhull, 3 Edwards, 79.

The case of the Attorney-General v. Berryman, 1 Dickens, 168, can have but little application here. In that case, there appears to have been no controversy. Lord Hardwicke decided that the legacy was good, and suggested that the king be applied to; who required that the attorney-general move the court of chancery to apply the money to such purposes as the deceased executor had named in his lifetime. The chancellor so ordered it. There appears to have been no contest, and no argument in the case upon the point in question.

The case of the Attorney-General v. Baxter, 1 Vernon, 248, has been strangely misunderstood by the learned counsel of the appellees. The king did, in that case, undertake to apply the money, and declared his pleasure to be that it should go toward the building of Chelsea College; but the lord keeper ultimately disregarded the act of the crown, and decreed the fund for the maintenance of a chaplain of Chelsea College, as the report of the case in Vernon shows.

The authorities cited in the appellants' first brief, it is not necessary to repeat. Lord Eldon, in Moggridge v. Thackwell, 7 Ves. 86, makes a critical examination of all the previous authorities, and finds himself bound, by the precedents for two hundred years, to arrive at the conclusion which he states.

Nothing can show more clearly the binding force of those precedents than Lord Eldon's statement, that, if he had sat in the court of chancery two hundred years earlier, he might have been inclined to make a different decision. In that case, which was precisely, for the present purpose, this case, he affirms the authority of the court itself to administer the charity, and proceeded accordingly to do so. The only difference between Moggridge v. Thackwell and the present case is, that in the former the devise was for objects not defined, as they are in this case.

In our first brief, when it is stated that it is not necessary to resort to the doctrine of *cy pres*, the context sufficiently shows that the phrase "*cy pres*" is used, as it frequently has been, to express the principle by which, when the objects designated

by the testator have failed, by reason of illegality or otherwise, the fund has been applied to purposes different from those which he expressed or intended. In this sense, the phrase is used in all our Pennsylvania cases, in which the doctrine of *cy pres* is disclaimed.

(The counsel then examined the cases of Witman *v.* Lex, 17 Serg. and Rawle, 91; Wright *v.* Linn, 9 Barr, 433; Morrison *v.* Beirer, 2 Watts and Serg. 87; Pickering *v.* Shotwell, 10 Barr, 26.)

Mr. Justice McLEAN delivered the opinion of the court.

This is an appeal in chancery, from the circuit court of the United States for the eastern district of Pennsylvania.

The case involves the construction of the will of Frederick Kohne. He first settled in Charleston, South Carolina, where he engaged in active business, and accumulated a large fortune. For many years before his death, his residence was divided between Charleston and Philadelphia. At the latter place, he added much to his wealth, in the acquisition of real and personal property. He had furnished houses in both cities, and a country house in the neighborhood of Philadelphia. Until his health became infirm, he resided a part of the year in the South, and the other part in the North. In May, 1829, he died in Philadelphia, where his will was made and published, in the month of April preceding his death. In his will, he declared himself to be of the city of Philadelphia.

After giving several annuities to his wife and others, and legacies to his friends in this country and in foreign countries, to charitable objects, and providing for the payment of them, he declares: " Forasmuch as there will be a surplus income of my estate, beyond what will be necessary to pay my said wife's annuity and the other annuities, I do therefore direct my said executors to invest the said surplus income, and all accumulation of interest arising from that source yearly, for and during all the term of the natural life of my said wife, in the purchase of such stocks or securities of the United States, or the State of Pennsylvania, or of any other State or States of the United States, or of the city of Philadelphia, bearing an interest, as they, in their discretion, may see fit; and from and immediately after the decease of my said wife, then all the rest, residue, and remainder of all my estate, including the fund which shall have arisen from the said surplus income aforesaid, after payment of the legacies hereinbefore directed to be paid, after the decease of my said wife, and providing for the payment of the annuities hereinbefore given, of those annuitants who may then be still living, I authorize and empower my executors or the sur-

vivor of them, after the decease of my said wife, to dispose of the same for the use of such charitable institutions in Pennsylvania and South Carolina, as they or he may deem most beneficial to mankind, and so that part of the colored population in each of the said States of Pennsylvania and South Carolina shall partake of the benefits thereof." His wife, Eliza Kohne, John Bohlen, and Robert Vaux, of the city of Philadelphia, and Robert Maxwell, of the city of Charleston, were appointed executors.

Mrs. Kohne survived her co-executors some years, and then died, having made her last will and testament, and appointed James L. Petigru and William Ravenel, the defendant, executors, the latter of whom obtained letters testamentary in the county of Philadelphia. And on the 15th of October, 1852, William Fontain, the complainant, obtained letters of administration *de bonis non*, on the estate of Frederick Kohne, deceased, he being the nearest of kin to the deceased, and one of his heirs at law.

The bill is filed in the name of the complainant, by certain charitable societies of Pennsylvania and South Carolina, under the directions of the will, to recover from the defendant, as executor of Mrs. Kohne, so much of the property as came to her hands as the executrix of her husband's will, and which she distributed, as undisposed-of property, after the death of her co-executors. And the question in the case is, whether the residuary bequest in the will, which authorized his executors, or the survivor of them, after the death of his wife, to dispose of the surplus " for the use of such charitable institutions in Pennsylvania and South Carolina, as they might deem most beneficial to mankind," has lapsed, no such appointment having been made, or attempted to be made, during the lifetime of the executors. This part of the property is understood to have amounted to a large sum.

The domicile of the testator, at the time of his death, seems not to be a controverted question. He had so lived in the two States of Pennsylvania and South Carolina, and amassed property in both, that his domicile might be claimed in either. There is no evidence in which, if in either, he exercised the right of suffrage. For two years previous to his death, he resided in Pennsylvania.

The bequest under consideration was intended to be a charity. The donor, having entire confidence in his executors, substituted their judgment for his own. They, or the survivor of them, was to designate such objects of his charity in the two States, " as would be most beneficial to mankind." It was to be placed on the broadest foundations of human sympathy, not

excluding the colored race. It is no charity to give to a friend. In the books, it is said the thing given becomes a charity where the uncertainty of the recipients begins. This is beautifully illustrated in the Jewish law, which required the sheaf to be left in the field, for the needy and passing stranger.

It may be admitted that this bequest would be executed in England. A charity rarely, if ever, fails in that country. The only question there is, whether it shall be administered by the chancellor, in the exercise of his ordinary jurisdiction, or under the sign-manual of the crown. Thus furnished with the judicial and prerogative powers, the intent of the testator, however vaguely and remotely expressed, if it be construed into a charity, effect is generally given to it. It is true, this is not always done in the spirit of the donor; for sectarian prejudices, or the arbitrary will of the king's instruments, sometimes pay little or no regard to the expressed will of the testator.

The appellants endeavor to sustain this charity under the laws of Pennsylvania. This is according to the course of the court. The case of The Philadelphia Baptist Association *v.* Hart's Executors, 4 Wheat. 1, was decided under the laws of Virginia, which had repealed the statute of 43 Elizabeth. In Beatty *v.* Kurtz, 2 Pet. 566, the pious use of a burial-ground was sustained under the bill of rights of Maryland. The case of Wheeler *v.* Smith, 9 How. 55, was ruled under the laws of Virginia. And in the case of Vidal *v.* Girard's Executors, the laws of Pennsylvania governed.

In Wheeler *v.* Smith, this court said, when this country achieved its independence, the prerogatives of the crown devolved upon the people of the States. And this power still remains with them, except so far as they have delegated a portion of it to the federal government. The sovereign will is made known to us by legislative enactment. The State, as a sovereign, is the *parens patriæ.*

There can be no doubt that decisions have been made in this country, on the subject of charities, under the influence of English decrees, without carefully discriminating whether they resulted from the ordinary exercise of chancery powers, or the prerogatives of the crown.

The courts of the United States cannot exercise any equity powers, except those conferred by acts of congress, and those judicial powers which the high court of chancery in England, acting under its judicial capacity as a court of equity, possessed and exercised, at the time of the formation of the constitution of the United States. Powers not judicial, exercised by the chancellor merely as the representative of the sovereign, and by virtue of the king's prerogative as *parens patriæ,* are not possessed by the circuit courts.

Fontain *v.* Ravenel.

In 2 Story's Eq. § 1189, it is said: "But as the court of chancery may also proceed in many, although not in all, cases of charities by original bill, as well as by commission under the statute of Elizabeth, the jurisdiction has become mixed in practice; that is to say, the jurisdiction of bringing informations in the name of the attorney-general, has been mixed with the jurisdiction given to the chancellor by the statute. So that it is not always easy to ascertain in what cases he acts as a judge, administering the common duties of a court of equity, and in what cases he acts as a mere delegate of the crown, administering its peculiar duties and prerogatives. And again, there is a distinction between cases of charity, where the chancellor is to act in the court of chancery, and cases where the charity is to be administered by the king, by his sign-manual. But in practice the cases have often been confounded, from similar causes."

"It is a principle in England, that the king, as *parens patriæ*, enforces public charities, where no other person is intrusted with the right. Where there is no trustee, the king, by his lord chancellor, administers the trust, as the keeper of the king's conscience; and it is not important whether the chancellor acts as the special delegate of the crown, or the king acts under the sign-manual, his discretion being guided by the chancellor."

It may be well again to state the precise question before us. "The executors, or the survivor of them, after the decease of the testator's wife, was authorized to dispose of the property, for the use of such charitable institutions in Pennsylvania and South Carolina, as they or he may deem most beneficial to mankind."

No special trust is vested in the executors, by reason of this power of appointment. It is separable and distinct from their ordinary duties and trust as executors. It was to be exercised after the death of Mrs. Kohne; but the executors died before her decease, and consequently they had no power to make the appointment. The conditions annexed by the testator rendered the appointment impossible. Had the contingency of the death of Mrs. Kohne happened, as the testator from her advanced age contemplated, during the life of the executors or the survivor of them, the appointment might have been made at his or their discretion. But had they or the survivor of them failed to make it, it might have become a question whether he or they could have been coerced to do so by the exercise of any known chancery power in this country. The will contained no provision for such a contingency, and it could not be brought under the trust of executorship. Chancery will not compel the execution of a mere naked power. 1 Story's Eq. § 169. But it will,

under equitable circumstances, aid a defective execution of a power. A power when coupled with a trust, if not executed before the death of the trustee, at law the power is extinguished, but the trust, in chancery, is held to survive.

The testator was unwilling to give this discretion to select the objects of his bounty, except to his executors. He relied on their discrimination, their judgment, their integrity, and fitness, to carry out so delicate and important a power. He made no provision for a failure, in this respect, by his executors or the survivor of them, nor for the contingency of their deaths before Mrs. Kohne's decease. They died before they had the power to appoint, and now what remains of this bequest, on which a court of chancery can act?

There must be some creative energy to give embodiment to an intention which was never perfected. Nothing short of the prerogative power, it would seem, can reach this case. There is not only uncertainty in the beneficiaries of this charity, but behind that is a more formidable objection. There is no expressed will of the testator. He intended to speak through his executors or the survivor of them, but by the acts of Providence this has become impossible. It is then as though he had not spoken. Can any power now speak for him, except the *parens patriæ?* Had he declared that the residue of his estate should be applied to certain charitable purposes, under the statute of 43 Eliz., or on principles similar to those of the statute, effect might have been given to the bequest, as a charity, in the State of Pennsylvania. The words as to the residue of his property were used in reference to the discretion to be exercised by his executors. Without their action, he did not intend to dispose of the residue of his property.

It is argued, "that in England the chancellor, in administering charities, acts as the delegate of the crown, inasmuch as he discharges all his judicial functions in that capacity." If, by this, it is intended to assert that the chancellor, in affixing the sign-manual of the king, or when he acts under the *cy pres* power, is in the discharge of his ordinary chancery powers, it does not command our assent.

The statute of 43 Eliz., though not technically in force in Pennsylvania, yet, by common usage, and constitutional recognition, the principles of the statute are acted upon in cases involving charities. Witman v. Lex, 17 Serg. and Rawle, 88.

In the argument, the case of Moggridge v. Thackwell, 7 Ves. 86, was cited, as identical with the case before us. "The only difference between the case and this one, it is said, is, that in the former the devise was for objects not defined, as they are in this case." In this the counsel are somewhat mistaken, as the case of Moggridge will show.

The devise in the will of Ann Cam was: "And I give all the rest and residue of my personal estate unto James Vaston, of Clapton, Middlesex, gentleman, his executors and administrators, desiring him to dispose of the same in such charities as he shall think fit, recommending poor clergymen who have large families and good characters; and I appoint the said John Maggridge and Mr. Vaston, before mentioned, executors of this my will."

In the final decree, " upon a motion to vary the minutes, Lord Thurlow declared, that the residue of the testatrix's personal estate passed by her will, and ought to go and be applied to charity," &c.

Now here was a trust created not only in Vaston, but in his executors and administrators, to whom the residue of the estate was bequeathed for the purposes of the charity. In this view, Lord Thurlow might well say, " the residue of the personal estate passed by the will." This was true, though Vaston was dead when the will took effect. This being the case, it is difficult to say that that case is identical with the one before us.

The case of Moggridge v. Thackwell was before Lord Eldon on a rehearing. He entered into a general view of the subject of charities, by the citation of authorities which showed the unreasonableness of the doctrine maintained by the courts, the inconsistencies in the decisions in such cases, and the gross perversions of charities by the exercise of the prerogative power; but at last he says: " Therefore I rather think the decree is right. I have conversed with many upon it. I have great difficulty in my own mind, and have found great difficulty in the mind of every person I have consulted; but the general principle thought most reconcilable to the cases is, that where there is a general indefinite purpose, not fixing itself upon any object, as this in a degree does, the disposition is in the king by sign-manual; but where the execution is to be by a trustee, with general or some objects pointed out, there the court will take the administration of the trust. But," he observes, " it must be recollected that I am called upon to reverse the decree of a predecessor, and of a predecessor who, all the reports inform us, had great occasion to consider this subject. I should hesitate with reference to that circumstance; but where authority meets authority, and precedent clashes with precedent, I doubt whether I could make a decree more satisfactory to my own mind than that which has been made."

It will be perceived that this decision was made reluctantly, and after much balancing of the law and the force of precedents, and chiefly, as it would seem, in respect to the decree of Lord Thurlow. This decision of Lord Eldon was made in 1802, and it is not known to have been recognized in this country.

Neither the doctrines on which this decision is founded, nor the doubts expressed by the chancellor, are calculated very strongly to recommend it to judicial consideration. The case, however, is different from the one before us, in this: the residuary estate of Mrs. Cam passed to the trustee; that of Mr. Kohne remained as a part of his estate in the hands of the executors, and descended to his heirs at law on the death of Mrs. Kohne. The beneficiaries were not more definitely described in the one case than in the other. In Kohne's case no trust was created, except that which was connected with the executorship.

Where there is nothing more than a power of appointment conferred by the testator, there is nothing on which a trust, on general principles, can be fastened. The power given is a mere agency of the will, which may or may not be exercised at the discretion of the individual. And if there be no act on his part, the property never having passed out of the testator, it necessarily remains as a part of his estate. To meet such cases, and others, the prerogative power of the king, in England, has been invoked, and he, through the chancellor, gives effect to the charity.

It would be curious, as well as instructive, on a proper occasion, to consider the principles, if principles they can be called, which were first applied in England to charities. Their most learned chancellors express themselves, in some degree, as ignorant on this subject. Lord Eldon said, in the case of Maggridge, "in what the doctrine originated, whether, as Lord Thurlow supposed, in the principles of the civil law, as applied to charities, or in the religious notions entertained formerly in this country, I know not; but we all know there was a period when a portion of the residue of every man's estate was appropriated to charity, and the ordinary thought himself obliged so to apply it, upon the ground that there was a general principle of piety in the testator."

In the above case, Lord Eldon again says: In Clifford *v.* Francis, this doctrine is laid down: that when money is given to charity, without expressing what charity, there the king is the disposer of the charity; and a bill ought to be preferred in the attorney-general's name. I cite this (he says) to show that it contains a doctrine precisely the same as the Attorney-General *v.* Syderfin, and the Attorney-General *v.* Matthews. So those three cases (he says) seemed to have established, in the year 1679, that the doctrine of this court was, that where the property was not vested in trustees, and the gift was to charity generally, not to be ascertained by the act of individuals referred to, the charity was to be disposed of, not by a scheme before the master, but by the king, the disposer of such charities in his character of *parens patriæ.*

Some late decisions in England, involving charities, evince a disposition rather to restrict than to enlarge the powers exercised on this subject. An arbitrary rule in regard to property, whether by a king or chancellor, or both, leads to uncertainty and injustice.

In a late case of Clark v. Taylor, 21 Eng. Law and Eq. 308, a gift, by will, to a particular charitable institution maintained voluntarily by private means, the particular intention having ceased: held that the gift was not to be disposed of as a charitable gift *cy pres*, but failed and fell into the residue."

In the case of the Baptist Association, Chief Justice Marshall says, there can be no doubt that the power of the crown to superintend and enforce charities existed in very early times; and there is much "difficulty in marking the extent of this branch of the royal prerogative before the statute. That it is a branch of prerogative, and not a part of the ordinary powers of the chancellor, is sufficiently certain." And in the case of the Attorney-General v. Flood, Hayne's Rep. 630, it is said: "The court of chancery has always exercised jurisdiction in matters of charity, derived from the crown as *parens patriæ*."

In the provisions of the act of Pennsylvania defining the powers of a court of chancery, in 1836, it is declared, "that in every case in which any court, as aforesaid, shall exercise any of the powers of a court of chancery, the same shall be exercised according to the practice in equity, prescribed or adopted by the supreme court of the United States."

In June, 1840, an act extended the jurisdiction of the supreme court within the city and county of Philadelphia, in chancery, in cases of "fraud, accident, mistake, or account;" and since then an act has been passed giving the orphans' court power where a vacancy exists in a trust to fill it, and also to dismiss trustees, executors, &c., for abuse of their trusts, &c. But no statutory provision is found embracing the case before us.

The chancery powers are of comparatively recent establishment in the State of Pennsylvania, and it does not appear that the *cy pres* power is given, and in the exercise of jurisdiction it seems to be disclaimed.

In King v. Rundle, 15 Barb. 139, "there being a number of charitable bequests to several charitable bodies, the remainder was bequeathed or devised to the Protestant Episcopal society, for certain purposes, &c.; the bequests to the religious bodies were held invalid, and so of the remainder over, as not being statutory tests. In Yates v. Yates, 9 Barb. 324, the court say: "We come to the conclusion that, as a court of equity, we possess no original inherent jurisdiction, to enforce the execution of a charitable trust void in law, as contravening the

33*

statute against perpetuities, as being authorized. In this case, where the use is a pious one, additional reasons might be urged against the exercise of such jurisdiction, were it important. Unless this trust will stand the statutory test to be applied to it, it must fall.

In the will of Sarah Zane, Mr. Justice Baldwin, sitting in Pennsylvania, and speaking of trustees, says: " They will be considered as trustees, acting under the supervision of this court, as a court of chancery, with the same powers over trusts as courts of equity in England, and the courts of this State profess and exercise." " When the fund shall be so ascertained as to be capable of a final distribution, it will be directed to be applied exclusively to the objects designated in the will, as they existed at the time of her death, and shall continue until a final decree; if any shall then appear to have become extinct, the portion bequeathed to such object must fall into the residuary fund as a lapsed legacy. Its appointment to other purposes or *cestuis que trust* than those which can, by equitable construction, be brought within the intention of the will of the donor, is an exercise of that branch of the jurisdiction of the chancellor of England which has been conferred on this court by no law, and cannot be exercised, *virtute officii*, under our forms of government."

And again, in Wright *v.* Linn, 9 Barr, 433, Bell, J., says: " Though the statute of 43 Elizabeth, ch. 4, relating to charitable uses, has not, in terms, been recognized as extending to Pennsylvania, we have adopted, not only the principles that properly emanate from it, but, with perhaps the single exception of *cy pres*, those which, by an exceedingly liberal construction, the English courts have engrafted upon it."

In the Methodist Church *v.* Remington, 1 Watts, 226, the court says : " The original trust, though void, was not a superstitious one ; nor if it were, would the property, as in England, revert to the State for the purpose of being appropriated *in eadem genera*, as no court here possesses the specific power necessary to give effect to the principle of *cy pres*, even were the principle itself not too grossly revolting to the public sense of justice to be tolerated in a country where there is no ecclesiastical establishment."

In Ray *v.* Adams, 3 Mylne and Keen's R. 237, it was held, " that where a power is by will given to a trustee, which he neglects to execute, the execution of the trust devolves upon the court; but if, in the events which happen, the intended trustee dies before the time arrives for the execution of the trust, and the trust therefore fails, the testator is to be considered as having so far died intestate.

In the case of Ommanney v. Butcher, 1 Turn. and Russ. R. 260, a testator concluded his will, "in case there is any money remaining, I should wish it to be given in private charity." Held, "if the testator meant to create a trust, and the trust is not effectually created, or fails, the next of kin must take."

There appears to be no law or usage in South Carolina that can materially affect the question under consideration. It seems to be conceded that if this charity cannot be administered by this court, in the State of Pennsylvania, it cannot be made available by the laws of South Carolina.

After the investigation we have been able to give to this important case, embracing the English chancery decisions on charities, as well as our own, and the cases decided in Pennsylvania, we are not satisfied that the fund in question ought to be withdrawn from those who are in possession of it, as the heirs of Frederick Kohne. There does not appear to us to be any safe and established principle, in Pennsylvania, which, under the circumstances, enables a court of chancery to administer the fund. It has not fallen back into the estate of the testator, because it was not separated from it. It remains unaffected by the bequest, because the means through which it was to be given and applied have failed. The decree of the circuit court is, therefore, affirmed.

Mr. Chief Justice TANEY and Mr. Justice DANIEL concurred in the judgment of the court, but dissented from the reasoning. Their opinions were as follows.

Opinion of Mr. Chief Justice TANEY.

I concur in the judgment of the court. But I do not, for myself, desire to express an opinion upon either the law of Pennsylvania or of South Carolina, in relation to charitable bequests. For, assuming every thing to be true that is stated in the complainant's bill, and that the bequest is valid by the laws of Pennsylvania, and would be carried into execution by the tribunals of the State, yet I think the circuit court of the United States had not jurisdiction to establish and enforce it; and was right, therefore, in dismissing the bill. I propose to show, very briefly, the grounds on which this opinion is formed.

Undoubtedly, a charitable bequest of this description would be maintained in the English court of chancery. The death of the executors, in the lifetime of the widow, would make no difference. The bequest would still be good against the heirs or representatives of the testator, and the fund applied to charitable purposes, according to a scheme approved by the chancellor, or authorized under the sign-manual of the king.

But the power which the chancellor exercises over donations to charitable uses, so far as it differs from the power he exercises in other cases of trust, does not belong to the court of chancery as a court of equity, nor is it a part of its judicial power and jurisdiction. It is a branch of the prerogative power of the king as *parens patriæ,* which he exercises by the chancellor.

Blackstone in his Commentaries, 3d vol. 47, enumerating what he states to be the extraordinary powers of the chancellor, says: "He is the general guardian of all infants, idiots, and lunatics, and has the general superintendence of all charitable uses in the kingdom; and all this over and above the vast and extensive jurisdiction which he exercises in his judicial capacity in the court of chancery." And in the same volume, page 437, he says: "The king, as *parens patriæ,* has the general superintendence of all charities, which he exercises by the keeper of his conscience, the chancellor; and, therefore, whenever it is necessary, the attorney-general, at the relation of some informant, files an *ex officio* information in the court of chancery to have the charity properly established."

So, too, Cooper, in his chapter on the jurisdiction of the court, says: "The jurisdiction, however, in the three cases of infants, idiots, or lunatics and charities, does not belong to the court of chancery as a court of equity, but as administering the prerogative and duties of the crown."

And in the case of the Baptist Association *v.* Hart's Executors, 4 Wheat. 1, this court, after examining many English authorities upon the subject, affirm the same doctrine. And Chief Justice Marshall, who delivered the opinion of the court, expresses it in the following strong and decisive language (p. 48): —

"It would be a waste of time," says the chief justice, "to multiply authorities to this point, because the principle is familiar to the profession. It is impossible to look into the subject without perceiving and admitting it. Its extent may be less obvious.

"We now find," he continues, "this prerogative employed in enforcing donations to charitable uses, which would not be valid if made to other uses; in applying them to different objects than those designated by the donor, and in supplying all defects in the instrument by which the donation is conveyed, or in that by which it is administered."

Resting my opinion upon the English authorities above referred to, and upon the emphatic language just quoted from the decision of this court, I think I may safely conclude that the power exercised by the English court of chancery "in

enforcing donations to charitable uses, which would not be valid if made to other uses," is not a part of its jurisdiction as a court of equity, but a prerogative power exercised by that court.

It remains to inquire whether the constitution has conferred this prerogative power on the courts of equity of the United States.

The 2d section of the 3d article of the constitution declares that the judicial power of the United States shall extend to all cases in law and equity specified in the section. These words obviously confer judicial power, and nothing more; and cannot, upon any fair construction, be held to embrace the prerogative powers, which the king, as *parens patriæ*, in England, exercised through the courts. And the chancery jurisdiction of the courts of the United States, as granted by the constitution, extends only to cases over which the court of chancery had jurisdiction, in its judicial character as a court of equity. The wide discretionary power which the chancellor of England exercises over infants, lunatics, or idiots, or charities, has not been conferred.

These prerogative powers, which belong to the sovereign as *parens patriæ*, remain with the States. They may legalize charitable bequests within their own respective dominions, to the extent to which the law upon that subject has been carried in England; and they may require any tribunal of the State, which they think proper to select for that purpose, to establish such charities, and to carry them into execution. But state laws will not authorize the courts of the United States to exercise any power that is not in its nature judicial; nor can they confer on them the prerogative powers over minors, idiots, and lunatics, or charities, which the English chancellor possesses. Nobody will for a moment suppose that a court of equity of the United States could, in virtue of a state law, take upon itself the guardianship over all the minors, idiots, or lunatics in the State. Yet these powers in the English chancellor stand upon the same ground, and are derived from the same authority, as its power in cases of charitable bequests.

State laws cannot enlarge the powers of the courts of the United States beyond the limits marked out by the constitution. It is true that the courts of chancery of the United States, in administering the law of a State, may sometimes be called on to exercise powers which do not belong to courts of equity in England. And, in such cases, if the power is judicial in its character, and capable of being regulated by the established rules and principles of a court of equity, there can be no good objection to its exercise. It falls within the just inter-

pretation of the grant in the constitution. But, beyond this, the. state laws can confer no jurisdiction on the courts of equity of the United States.

In the cases in relation to charities which have. come before this court, there has been a good deal of discussion upon the question, whether the power of the chancery court of England was derived from 43 Elizabeth, or was exercised by the court before that act was passed. And there has been a diversity of opinion upon this subject in England, as well as in this country. In the case of the Baptist Association *v.* Hart's Executors, Chief Justice Marshall, who delivered the opinion of the court, (*vide* 4 Wheat. 49,) and. Mr. Justice Story, who wrote out his own opinion, and afterwards published it in the appendix to 3 Pet. Rep., (*vide* p. 497,) were both at that time of opinion that it was derived from the statute. But in Vidal *v.* Girard's Executors, 2 How. 127, Mr. Justice Story changed his opinion, chiefly upon the authority of cases found in the old English records, which had been printed a short time before by the commissioners on public records in England. It appeared from these records that the power had been exercised in many cases long before the statute was passed.

But this circumstance does not affect the question I am now considering; for, whether exercised before or not, yet, whenever exercised, it was in virtue of the prerogative power, and not as a part of the jurisdiction of the court as a court of equity. The statute conferred no new prerogative on the ‵crown. . And Lord Redesdale, 1 Bligh.‵ 347, while he held that the power existed in the chancellor before the statute, and had been frequently exercised, declares it to be a prerogative power, and says ∴ " The king, as *parens patriæ*, has a right by his proper officer, the attorney-general, to call upon the several courts of justice, according to the nature of their several jurisdictions, to see that right is done to his subjects who are incompetent to act for themselves, as in the case of charities and other cases."

Besides, if it could be shown that at some remote period of time the court of chancery exercised this power as a part of its ordinary jurisdiction as a court of equity, it would not influence the construction of the words used in the constitution. For at the time that instrument was adopted, it was universally admitted by the jurists in England and in this country, as will appear by the references above made, that this extraordinary and unregulated power in relation to charities was not judicial, and did not belong to the court as a court of equity. The constitution of the United States, as I have before said, grants only judicial power at law and in equity to its courts; that is, the powers at that time understood and exercised as judicial, in the

courts of common law and equity in England. And it must be construed according to the meaning which the words used conveyed at the time of its adoption; and the grant of power cannot be enlarged by resorting to a jurisdiction which the court of chancery in England, centuries ago, may have claimed as a part of its ordinary judicial power, but which had been abandoned and repudiated as untenable on that ground, by the court itself, long before the constitution was adopted.

Cases may arise in a circuit court of the United States, in which it would be necessary to decide whether the English doctrine, as to charities, was founded on the statute, or was a part of the law of England before the statute was passed. And in a suit by an heir or representative of the testator, (authorized from his place of residence to sue in a court of the United States,) to recover property or money bequeathed to a charity, the court must of necessity examine whether the bequest was valid or not by the laws of the State, and barred the claim of the heir or representative. And if in such a case it appeared that the State had not adopted the statute, it would be necessary to inquire whether the law in relation to these bequests was a part of the common law before the statute, and administered as such by the English court of chancery, and whether it had been adopted by the State as a part of its common law. For the prerogative powers of the English crown in relation to minors, idiots, or lunatics, and charities, are a part of the common law of England; and the people of any State, who deemed it proper to do so, might vest these powers in the courts of the State.

Such an inquiry was necessary in the case of Vidal. *v.* Girard's Executors, and of Wheeler *v.* Smith. But the question of jurisdiction is a very different one when a court of the United States is called upon to execute the duties of the sovereignty of the State, and to take upon itself the discretionary powers which, if they exist at all by its common law or statutes, belong to the official representatives of the *parens patriæ,* that is, the state sovereignty. And in the case of the Baptist Association *v.* Hart, although the court did not expressly deny its jurisdiction to establish the charity, if it had been valid by the laws of Virginia, yet it expressed its doubts upon the subject, saying that the question could only arise where the attorney-general was a party.

For these reasons a court of chancery of the United States must, in my opinion, deal with bequests and trusts for charity as they deal with bequests and trusts for other lawful purposes; and decide them upon the same principles and by the same

rules.　And if the object to be benefited is so indefinite and so vaguely described, that the bequest could not be supported in the case of an ordinary trust, it cannot be established in a court of the United States upon the ground that it is a charity. And if, from any cause, the *cestui que trust,* in an ordinary case of trust, would be incapable of maintaining a suit in equity to establish his claim, the same rule must be applied where charity is the object, and the complainant claims to be recognized as one of its beneficiaries.

I concur, therefore, in affirming the judgment of the circuit court, dismissing the bill; but I concur upon the ground that the court had no jurisdiction of the case stated by the complainant, and express no opinion as to the validity or invalidity of this bequest, whether in this respect it be governed by the laws of Pennsylvania or of South Carolina.

Mr. Justice DANIEL.

Whilst I concur in the decision of this court, in affirming the decree of the circuit court dismissing the bill of the appellants, in portions of the argument by which this court have come to their conclusion, I cannot concur.　In expressing my dissent, I shall not follow the protracted argument throughout its entire length; my purpose is, chiefly, to free myself on any future occasion from the trammels of an assent, either expressed or implied, to what are deemed by me the untenable, and, in this case, the irrelevant positions, which that argument propounds.

I readily admit that the courts of chancery of the United States are vested with no prerogative power, can exercise no power or function similar to those derived to the lord chancellor in England, either by commission under the sign-manual of the king, as *parens patriæ,* or in the application of the often-abused and oppressive doctrine of *cy pres,* or in virtue of the provisions of the statute of 43 Elizabeth.　But this concession, taken in its broadest extent, by no means establishes the inference that the court of chancery in England, as a court of equity, by virtue of its inherent, and, if I may so speak, constitutional powers, apart from the prerogative and apart from the statute of Elizabeth, could not take jurisdiction of trusts, either in the establishment or maintenance of those trusts, because they expressed or implied a charitable end or purpose, or because the charitable objects were not defined with perfect precision.　And if such a power inhered and existed constitutionally in the court of chancery in England as a court of equity, does it not follow, *ex consequenti,* that, the constitution and laws of the United States, constituting the courts of equity of the United States with express reference to the character and

functions of the court of chancery as a court of equity in England, have conferred upon the former the regular inherent powers of the latter?

Much of the learned and elaborate opinion of this court, delivered by the late Justice Story, in the case of Vidal et al. *v.* Girard's Executors, 2 How. 127, nay, the great end and stress of that opinion, as correctly apprehended, consisted in the maintenance of the position that, apart from the prerogative power with which the lord chancellor was clothed, and independently of the statute of Elizabeth, and long anterior to the enactment of that statute, wherever there was a devise or bequest to a person, natural or artificial, capable of taking, and a beneficiary under the devise or bequest sufficiently certain and defined to be made the recipient of such a gift, the court of chancery, in the exercise of its regular and inherent jurisdiction, as a court of equity in relation to trusts, (one of the great heads of equity jurisdiction,) would establish and protect such devise or bequest, even in cases where the objects thereof were somewhat vague in their character, and although such devise contained a charity. To this express point, too, are the numerous decisions produced by the industry of the learned and able and distinguished counsel for the devisee, as the result of the researches made in the records of the chancery court, by a commission created under the authority of the British parliament.    Indeed, the decision of this court in the case of Vidal *v.* Girard's Executors, would seem to be incomprehensible and without purpose, unless interpreted as asserting and maintaining, both upon reason and authority, the regular jurisdiction of equity over devises, wherever the devisee was capable of taking, and the beneficiaries were sufficiently defined to render the directions of the testator practicable, although these directions declared or implied a charity.

It is somewhat curious to observe, that the opinion of Lord Redesdale, in the case of the Attorney-General *v.* The Mayor of Dublin, 1 Bligh, 312, is appealed to in support of the doctrine now promulged, when that same case is avouched and relied on in the case of Vidal *v.* Girard's Executors, in support of the legitimate and regular powers of the courts of equity. This application of the language of Lord Redesdale would seem to grow out of the simple fact, that, in the case before him, the attorney-general was a party.    But what is the declaration of his lordship, in reference to the powers of a court of equity over subjects like the one under his consideration?    After denying that the statute of Elizabeth created any new law, and asserting that it only created a jurisdiction merely ancillary to that previously existing in the chancery court, he observes that

the proceedings under that commission were still subject to appeal to the lord chancellor, and he might reverse or affirm what had been done, or make such order as he might think fit, reserving the controlling jurisdiction of the court of chancery as it existed before the statute. He then continues, as pointing out a different mode of effecting the same objects, and from a different source of power, to declare, that the same thing might be done by the attorney-general, by information, in virtue of the prerogative.

So, too, it is affirmed by this court, *nemine contradicente*, in the case of Vidal *v.* Girard's Executors, that Lord Chancellor Sugden, in the case of the Incorporated Society *v.* Richards, 1 Drury and Warren, 258, upon a full survey of all the authorities where the point was directly before him, held the same doctrine as Lord Redesdale; and expressly decided that there was an inherent jurisdiction in equity in cases of charity, anterior to and independently of the statute of Elizabeth.

Upon a just understanding of the opinion of the court in the case of Vidal *v.* Girard's Executors, and of the interpretation given, in that opinion, to the English authorities relied on, it seems impossible to escape from the conclusions, that devises to persons capable of taking, in trust for beneficiaries sufficiently defined, and for purposes neither illegal nor immoral, and where there exist no objections to parties such as would exclude the jurisdiction of the courts in other cases, the courts of the United States as courts of equity, in the exercise of regular, inherent, equity powers in relation to trusts, will sustain and enforce such devises. These conclusions seem to follow inevitably from the ruling of this court in the case of Vidal *v.* Girard's Executors. Indeed, they seem to be comprised within the literal terms of that decision; and the decision now made seems to me incomprehensible, unless understood as designed to overrule that case, and every authority from the English chancery cited and commented upon in its support. For such an assault upon the previous decision of this court, wielding a blow so trenchant and fatal at one great and acknowledged head of equity jurisprudence, the head of trusts, my mind is not prepared.

There is a principle, and, in my opinion, the correct principle, on which the decision of this court may be placed, without the innovation which is objected to. It is that on which my concurrence in the decree of this court is founded, and one, too, which steers entirely clear of what is by me deemed exceptionable. That principle is this: That, by the will of Frederick Kohne, the devisees in trust were clothed with a merely naked power, to be exercised by them as the special and exclu-

sive depositories of the testator's confidence, and that power to be dependent on conditions upon which, and on which alone, they should have authority to act. In the progress of events to which the devise was necessarily incident, the powers created and to be executed by the devisees in trust, have become impracticable and void. These depositories of the testator's confidence are all dead. The conditions on which their powers were made dependent, never did occur, and can by no possibility ever occur. It follows, therefore, that, in conformity with the will, there is no person who can act, and no subject to be acted upon, and no beneficiaries of the contemplated action. My opinion, therefore, is, that the devise has lapsed, or, rather, that no right ever came into existence under it; that nothing was ever passed by it from the estate, which descends, of course, to the testator's heirs.

### Order.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the eastern district of Pennsylvania, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said circuit court in this cause be and the same is hereby affirmed, with costs.