PRESIDENT AND FELLOWS OF HARVARD COLLEGE *vs.* SOCIETY FOR PROMOTING THEOLOGICAL EDUCATION & others.

A bill in equity for the transfer of a public charity to new trustees may be filed by the present trustees in their own names, making the attorney general a defendant.

This court cannot, in the exercise of its chancery jurisdiction, withdraw funds given by individuals to the Corporation of Harvard College in trust for the promotion of theological education at the college, or for the benefit of a divinity school attached to the college, and intrust them to an independent board of trustees, to be applied to the support of a divinity school not connected with the college, merely on the ground of inconvenience and embarrassment in continuing the connection between the college and the divinity school, and of the benefit which would result to both from a separation, and without proof of incapacity or unfaithfulness on the part of the corporation, or failure of the objects of the charity.

BILL IN EQUITY, praying for leave to transfer to the Society for Promoting Theological Education, or to such other trustees as the court might appoint, the funds held by the plaintiffs in trust for the benefit of the divinity school attached to the college. The attorney general, and the donors of the funds, or their heirs, were made defendants. The case was argued *ex parte* by *C. G. Loring & W. H. Gardiner,* for the plaintiffs.

The facts of the case, and the grounds taken in argument, are stated in the opinion, which was delivered at November term 1855 by

DEWEY, J.* The present case is one of a deeply interesting character, whether considered with reference to the general principles involved in it, or its own intrinsic importance.

The case has been argued *ex parte*, no counsel appearing in opposition to granting the prayer of the complainants. This, in a case of a public charity, would ordinarily impose upon the court the duty of greater vigilance, to see that no change was made, either in the application of the charity or the management of the same, that would be unauthorized, having regard to the declared intentions of the donors.

We are happy to say in reference to this, that we have been much aided by the very elaborate and impartial presentation, by the counsel for the complainants, of all the important adjudicated cases adapted to give us aid on the questions raised, and by their frankly and candidly opening before us the various objections which, in the view of others, existed, or might be urged against granting the prayer of the complainants and making the proposed change.

In the consideration by the court of the case before us, the first inquiry that arises is as to the form of the bill, and whether it is proper and adapted to the case stated and the relief sought. Here the question is simply whether the bill, being one in relation to a public charity, should not have been instituted by the attorney general, at the relation of the complainants or others.

It is true that such is the usual form of bills in relation to public charities. Such is the form of most of the bills in the cases cited by the learned counsel as bearing upon the general questions arising upon the merits of this bill. But although such is the more usual form, we do not perceive any objection to that adopted in the present case, looking at the case stated and the objects of this bill.

The prayer of this bill is not founded upon any allegations of

---

* The chief justice did not sit in this case.

legal incapacity of the trustees to administer the charity, or any failure to execute the trust by reason of any present want of actual trustees, nor upon any allegation of abuse of trust by the present trustees ; but its avowed purpose is simply that the trustees may, under the sanction and approval of this court, on the ground of expediency and of the difficulty of managing the trust, resign their trust into other hands. Such being the nature of the bill, we see no objection to the trustees filing it in their own behalf, making the attorney general, as representative of the Commonwealth, a party defendant. This course seems to have been directly sanctioned in two cases cited by the counsel of the complainants. *Governors of Christ's Hospital* v. *Attorney General*, 5 Hare, 257. *Clum Hospital* v. *Lord Powys*, 6 Jurist, 252, cited in 1 Chit. Eq. Dig. 479, *pl.* 11.

The next inquiry opens a much wider field—the power of this court, as a court of chancery, to regulate and control the administration of public charities, and to what extent and under what circumstances that power can be properly exercised. The exercise of any chancery power by this court, beyond that of relief in cases of mortgages and penal bonds, is of comparatively recent origin, and has ever been exercised with a cautious hand, and strictly with reference to the class of cases named in the statutes. The first was the statute of 1817, *c.* 87, which, with the other statutes enacted prior to 1836, was superseded by the Rev. Sts. *c.* 81, § 8. Among the subjects of chancery jurisdiction therein enumerated, is that of " enforcing and regulating the execution of trusts." Upon this branch of equity we have the general jurisdiction of the court of chancery in England. *Hadley* v. *Hopkins Academy*, 14 Pick. 253. *Sanderson* v. *White*, 18 Pick. 328. *Parker* v. *May*, 5 Cush. 341.

To some extent, the exercise of this power is very familiar to us. In reference to cases of public charities, no doubt exists as to the authority of this court to compel their proper execution, to reform all abuses of trust, and to supply trustees where there are none in existence to carry into effect the objects of the gift. But the prayer of this bill invokes the exercise of powers as a court of chancery in another form, and connected with a subject

of such magnitude and interest as requires a searching and anx-
ious inquiry as to our powers, and the proper occasion for their
exercise.

That any such exercise of the power of a court of chancery
over a public charity, of the character and under the circum-
stances of this case, and to the extent asked in this bill, has ever
actually been sanctioned by a decree of any court of chancery
in any of the states .of this Union, is not, we believe, suggested;
certainly we have seen no such precedent in the reported cases.
It is the English cases to which we are referred, and which are
supposed by the plaintiffs to furnish authority for granting the
prayer of this bill.

Upon this subject the whole chapter on public charities in
Story's Commentaries on Equity Jurisprudence is highly instruc-
tive, and presents, in the notes, most of the leading cases on the
subject. 2 Story on Eq. *c.* 32. Judge Story, after stating vari-
ous general propositions, in terms apparently quite liberal, as to
the exercise of the authority of a court of chancery over public
charities on occasions justifying such interference, adds : " The
disposition of modern judges has been to curb this excessive
latitude of construction assumed by the court of chancery in
early times." " The doctrine of *cy pres*, as applied to charities,
was formerly pushed to a most extravagant length." " The
court will not now decree the execution of the trust of a charity
in a manner different from that intended, except so far as it is
seen that the intention cannot be literally executed." 2 Story
on Eq. §§ 1174, 1176.

Following the order pursued in the argument, I will briefly refer
to the leading cases cited by the learned counsel as furnishing
precedents for maintaining the bill. The case of *Attorney Gen-
eral* v. *Boultbee*, 2 Ves. Jr. 380, affirms the principle that, although
the particular intention fails, the general intention shall be exe-
cuted *cy pres*. The case of *Attorney General* v. *Whitchurch*,
3 Ves. 141, is to the same effect, holding that, whenever a char-
ity cannot be executed as directed, but may be executed substan-
tially by another mode, it shall be so executed. But in the
former of these cases the master of the rolls said · " The court

will not decree execution of a trust of a charity in a manner different from that intended, except so far as they see that the intention cannot be executed literally; but another mode may be adopted, consistent with the general intention." 2 Ves. Jr. 387, 388.

The case of *Attorney General* v. *Andrew,* 3 Ves. 633, was of a charity given to the trust of a college in the University of Cambridge, England. The college declined administering the trust, and the chancellor found, upon the evidence, that the college had never accepted the trust, and that they had only acted as trustees so far as was necessary to preserve the funds. Upon that ground they were discharged from the trust; but the chancellor expressly repudiated the idea of withdrawing such a trust, accepted by their predecessors, upon the ground that the college were put to inconvenience or supposed disadvantage by continuing to administer the charity.

The case of *Attorney General* v. *Dixie,* 2 Myl. & K. 342, was a devise of property for the establishment of a grammar school; and the funds proving more than sufficient for such a school, the court of chancery allowed other branches of education to be introduced, leaving undisturbed the original grammar school. The case of the *Attorney General* v. *Haberdashers' Co.* 3 Russ. 530, is to the same point; there being no change of the original school and no change of trustees.

The cases of *Greenwood* v. *Wakeford,* 1 Beav. 576, and *Coventry* v. *Coventry,* 1 Keen, 758, were cases of private trusts, as to which we suppose the court of chancery may properly allow a change of trustees upon grounds that would be entirely inadequate in cases of public charities, the one being principally financial, the other clothed with general administrative powers and supervision of the application of the public charity. The cases just cited are the same referred to in Hill on Trustees, 190, and illustrate and qualify what might otherwise seem a more general proposition enunciated by the writer.

The case of *Attorney General* v. *Ironmongers' Co.* 2 Beav. 313, and 2 Myl. & K. 576, was a case arising upon a failure of one class of objects of the public charity of Thomas Betton

and the only question was, how, upon such failure of one of the specified objects, that portion of the fund should be applied. The case was pending for a long period, and presents the views of Sir John Leach, master of the rolls, followed by those of Lord Brougham, and was subsequently discussed by Lord Langdale, master of the rolls, and finally settled by Lord Chancellor Cottenham.    The case is an interesting one, as a discussion of the question, what is a *cy pres* appropriation of a public charity, and how far a court of chancery may depart from the declared purpose of the donor, in the application of his charity, where there is a failure of the particular objects named by him. But that case proposed no change of trustees, but only sought the direction of the court as to the application of a fund unexpended for want of the existence of the object named by the donor. · Various philanthropic schemes had been proposed for its application ; but, upon the final disposition of the case by the decree of Lord Cottenham, they were all rejected, and it was held that it must be applied to one of the other specified objects of the charity, to which a portion of the same was given by the donor.

The case of *Ex parte Blackburne*, 1 Jac. & Walk. 297, was a charity for poor boys, and among the trustees were certain trustees *ex officio*, who were by the court of chancery released from the charge of safe-keeping and management of the funds composing the charity, on the ground of inconvenience in managing the same.   But the change authorized by the court was only to the extent of trusteeship for managing the funds, leaving the selection of the persons to be the subjects of the bounty to be made by the original trustees, in conformity to the declared intent of the donor.

The case of the *Reading Dispensary*, 10 Sim. 118, arose under the statute of 52 G. 3, *c.* 101, known as Sir Samuel Romilly's Act, and the more immediate question was as to the authority, under that act, to transfer charity funds from the present managers to another ; but the remarks of Vice Chancellor Shadwell are very significant upon the broader question of the general powers of a court of equity in such cases, and will not be found to aid the complainants.

The case of *Attorney General* v. *Caius College*, 2 Keen, 150, was a public charity given to establish a free grammar school in Cambridge. The bill alleged an abuse of trust by the college, and sought to have the funds transferred to other trustees. The court refused to appoint new trustees, though there had been at a former period a misapplication of the funds. In giving the opinion of the court, Lord Langdale, master of the rolls, said: "The founders of many charitable institutions have thought fit to appoint colleges to be trustees of their foundations. The law has allowed this to be done, and courts of equity are not, in my opinion, at liberty to say that this shall not be done, upon the notion that, when individuals are trustees, there is a greater personal responsibility." 2 Keen, 165.

With such lights as are thus furnished us, we enter upon the consideration of the particular case before us. Here the general question is, whether a case is presented in which the court can, in the exercise of any chancery powers they possess, properly and legally withdraw these funds from the present trustees, and appropriate them to a divinity school not connected with Harvard College, and to be administered by a board of independent trustees. This question, as was truly said by one of the learned counsel for the complainants, " is one purely for the decision of the court, upon its own sole responsibility, in the exercise of one of its highest functions, upon one of the most delicate and sacred subjects committed to its care." We feel this responsibility, and this imposes upon us, in the first place, the duty to look carefully to the character of these trusts, their origin, and the leading purpose of the donors. This involves the inquiry, whether the leading object in raising these funds was to furnish theological education in Harvard College by a school, a branch of that university, and whether these donations were not given by the donors to the special trust and charge of those composing the government of Harvard College, and with the expectation that they would always remain under their supervision, and have the security arising from the well known organization of the government of the college.

As to the donations made for theological instruction prior to

the year 1815, no question is made, and it is conceded that they ought to remain in the hands of the government of Harvard College. It is only necessary to refer to them as showing the then existing state of things, and that there was in fact a course of theological instruction, imperfect it may have been, then pursued in connection with the college. Such instruction was then given at the college to a few students in divinity, under the direction of the Hollis Professor of Divinity. See page 4 of Report of Committee of Board of Overseers in 1846.

As to the origin of the measures that led to the large addition to the funds, for the purpose of promoting theological instruction, that was made in 1815 and 1816, there can be no controversy. This is very fully stated in the documents spread before us by the complainants. The facts may be found also in Quincy's History of Harvard University, as well as in the Report of the Board of Overseers made in 1846. It appears that, soon after the donation of Samuel Parkman, given to aid in the support "of a professor of theology at the said college," and under the date of December 18th 1815, a circular was issued by the corporation of Harvard College, representing the necessity of raising a fund for increasing the means of theological education in the institution. This circular states the object to be " to adopt measures for increasing the means of theological education at the university. In order to enable students in divinity to reap the benefit of the eminent advantages which the college possesses for this purpose, there is need of funds for assisting meritorious students in divinity, of limited means, to reside at the university for a requisite time."

It is apparent, therefore, that the movement to obtain these funds proceeded directly from the corporation of Harvard College. In consequence of this appeal made by them to the public, the sum of about thirty thousand dollars was soon raised, and, agreeably to their suggestion, a voluntary unincorporated society, under the title of " The Society for the Promotion of Theological Education at Harvard University," was established.

These funds, as soon as obtained, were used by the government of Harvard College, in connection with other funds held

by the college, in providing instruction in theology. In 1819 the theological school received a formal organization, and the Hollis Professor of Divinity, the Hancock Professor of Hebrew, and the Dexter Professor of Sacred Criticism were designated as the instructors in the theological department of the university. By the provisions of the articles of association of the society above named, certain officers of that society were in certain matters to act jointly with the corporation of the college ; but it was expressly provided in these articles that the professors and instructors in the theological school were to be chosen according to the usages in the university. Subsequently, in the year 1824, a new constitution was adopted by the society, introducing provisions giving certain officers in that society a greater participation in the management of the theological school. This arrangement continued for a time, but was not satisfactory to all parties ; and, after some further attempts to introduce other modifications, it was deemed expedient by the society to transfer whatever separate funds they held directly to the corporation of the college ; whereupon the whole management of the divinity school in every respect was, in 1830, vested in the government of the college, and has so continued ever since.

By article 10 of the constitution of the society, adopted in 1824, it was provided " that if at any time hereafter the society shall think it best to appropriate the funds to be hereafter collected, to a theological institution disconnected from Harvard College, and if the directors of this society and the President and Fellows of Harvard College shall assent thereto, it shall be lawful for the society to appropriate all the funds hereafter collected to such other theological institution." By the deed of transfer to the corporation in 1830, the power to transfer such funds as were collected by this society, after 1824, to a separate institution, was given to the corporation, the amount being about nineteen thousand dollars. It will be seen that it was confined strictly to funds collected by the society after 1824. In 1841, a donation of ten thousand dollars was made to the corporation of the college, through the efforts of an incorporated society established in 1831, " for promoting theological education," and

"the Berry Street Conference." This fund was subject to the condition that, in case the fund of nineteen thousand dollars, above mentioned, should ever be appropriated to the support of a theological school separate from the college, this donation should have the like appropriation.

There is certainly ground for the argument that the donors of these particular sums contemplated the possibility of their being appropriated to a theological school distinct from the college, and that these sums might, without any violation of the intention of the donors, be so transferred, if the president and fellows assent thereto. We do not however understand that it is the purpose of this bill to ask any such limited transfer, leaving the government of the college to continue to administer the remaining and much larger donations, which they hold from other sources, in trust for promoting theological education. We are therefore brought back to the inquiry as to the character of the other donations given to them in trust for promoting theological education.

It appears that, just previous to the circular of the corporation, issued in 1815, soliciting donations for this purpose, Samuel Parkman had given what was then deemed a large donation, to be applied "to support a professor of theology at the said college;" and he had further declared "that it be considered one of the special duties of said professor to instruct and take charge of such resident graduates at the said college as may be intended for the ministry; and this condition shall form a part of any statutes which may be made by said President and Fellows of Harvard College; it being, however, understood that this shall not prevent the corporation from assigning to such professor any other duties, relative to the general instruction of the students in said college in theology, not in their opinion inconsistent with this principal design;" thus directly connecting the donation with the college.

Many of the other donations, made subsequently to this, are equally explicit. The large bequest of Sarah Jackson, of ten thousand dollars, is given "to the President and Fellows of Harvard College, in trust to hold the same for the benefit of the

theological seminary connected with said college ; " and accompanied with this further provision : " I direct that the said sum of ten thousand dollars shall be forever holden in trust as aforesaid, as a capital stock, and to be called the Jackson Foundation, the income thereof to be annually appropriated for the support of poor and deserving scholars, students in said theological seminary, and for no other use or purpose whatsoever." That of Eliphalet Porter was " to be forever applied to the purpose of promoting theological education in the university at Cambridge ; " and that of George Partridge was given " in aid of the funds of the institution for the promotion of theological education in that university." As to that of Thomas Carey, his will directs " that the president and fellows of said college appropriate the same in assisting young men in preparing themselves for the Christian ministry." That of John Foster was given " for the purpose of assisting such students of theology, law and medicine, or either of them, as shall be poor, to pay the net income thereof annually to assist such and so many of the said students as said corporation shall consider the most necessitous, and, at the same time, meritorious."

The will of Benjamin Bussey (1842) provides for the conveyance to the President and Fellows of Harvard College, after the discharge of certain precedent trusts and annuities, of a large and valuable estate, which estate the testator declares " shall be taken and held by said President and Fellows of Harvard College as a permanent public corporate body, specially charged with the care and superintendence of the higher branches of education." He then proceeds to declare the objects of his bounty, and, after making an appropriation for an agricultural school, to be under the supervision of the college government, declares that, as to the net income of one half of all the estate so conveyed, " there shall be annually appropriated one half thereof to the encouragement and promotion of theological education, and the other moiety to the encouragement and promotion of legal education in said college."

Several donations are given in more general terms ; some of them, " to the theological school ; " some, " to the use of

the divinity school;" others, "to the theological institution at Cambridge," or "to the divinity school attached to said college."

In seeking the answer to the inquiry whether these funds, or some considerable portion of them, were specially intrusted, as to their management and oversight, to the government of Harvard College, we have thus looked at the declarations of trust, as declared by the donors. In pursuing this inquiry, we naturally look at the character of the trustees thus selected by the donors, to ascertain whether it was one in which peculiar confidence might be placed, and one well adapted for securing permanently the faithful execution of such trust. We find that the government of Harvard College was composed of the president and fellows, a permanent corporate body, its members being selected from our most distinguished and responsible citizens, acting in connection with a board of overseers embracing the highest public functionaries in the Commonwealth, both executive and legislative, associated with thirty other persons selected from the various professions and other avocations, for their supposed devotion to the cause of sound learning.

The question whether the theological school was intended by the donors to be attached to Harvard College as a branch of the university, and to be under the control of the government of the college, was somewhat early discussed, in consequence of a claim urged by the Society for Promoting Theological Education in Harvard College to have a greater participation in the government of the same. The subject was referred by the president and fellows to a committee of their board, consisting of Rev. Dr. Kirkland, Hon. Charles Jackson, and Hon. Francis C. Gray, from whose report we make the following extract: "We think that the college government cannot with propriety alienate one of the chief departments of the institution committed to their care, and that to do so would defeat the declared object of the contributors to the theological fund, which was to promote theological education in Harvard University." This report, made on the 17th of May 1827, was accepted by the president and fellows.

The character of these donations was also very clearly and

distinctly stated in the report of a committee of the board of overseers of the college, made in 1846, and accepted by that board. In this report, the sources of these funds, and their connection with the college, are fully considered. This report, after stating the nature of these funds, and the sources from which they were derived more in detail, proceeds to state the result thus: " We therefore consider all gifts and grants to the divinity school at Harvard College, or at Cambridge, or the theological institution at Cambridge, or for the promotion of theological education at Harvard College, or at Cambridge, or any equivalent expression, indicating this object, to be gifts to the president and fellows of the college, in their corporate capacity, in trust for the purpose expressed by such designation. These funds, then, all stand on the same foundation, with the questionable exception of a comparatively small portion of them, [alluding to the donations of nineteen thousand dollars and ten thousand dollars above mentioned,] and they are, either in express terms, or by necessary implication, donations to the college government in its corporate capacity, to be held in trust and applied conformably to the constitution and laws of that institution, and subject to the same superintendence and revision of the board of overseers as they are under in regard to funds appropriated to promote improvement in all branches of knowledge and all departments of education established therein, to the advancement of theological science and the promotion of theological education, as branches of education within the scope and purposes of an university." See Report of Committee of Board of Overseers, appointed " to consider the expediency of disconnecting entirely the theological department from the college," accepted by the board, February 8th 1846.

Having thus ascertained the source of these donations composing this public charity, the next inquiry is, upon what grounds the complainants ask for the interposition of this court as a court of chancery, to withdraw this trust and commit it to new trustees, and to be by them applied to a separate and wholly independent divinity school. For such reasons we look at the bill of the complainants, and the grounds there assigned.

Upon this point we remark, 1st. That there is no suggestion made, nor do any doubts exist, as to the legal capacity of the President and Fellows of Harvard College to accept these trusts and to administer them. 2d. There is no complaint, from any quarter, that this public charity has not been thus far faithfully administered by its present trustees. 3d. No case is stated for our interposition by reason of a failure of the objects of this charity, of the precise kind indicated by the terms of the gift. 4th. No failure of the particular trustees named by the donor, either by reason of the non-existence of the persons, or by reason of any refusal on their part to accept the trust. 5th. No accumulation of funds so large, that, after exhausting the particular specified objects of the charity, the trustees seek the direction of the court to apply the surplus, *cy pres.* All these grounds for invoking the aid of the court, and which have furnished the occasion and the authority for the interference of the court of chancery in the cases referred to as precedents, are wanting in the present bill.

The causes assigned are of a different character. They may be thus stated in brief, or as a summary of this part of the bill; namely, that it has become apparent to the complainants that the college and the theological school cannot be conveniently managed by one and the same corporation; that the exercise of the trusts of the public charity for a divinity school is in a high degree inconsistent with and injurious to the due execution of another and prior trust vested in them as trustees of the college; and further, that the united management of the two institutions is also injurious to the divinity school, and the present trustees cannot acceptably fulfil the intents and purposes of the donors of that charity, as the same might be fulfilled by other trustees, and by a separate institution wholly disconnected from the college. These positions are in the bill accompanied with a more detailed statement of the grounds relied upon to sustain them. 1st. It is said that the college is, to some extent and for certain purposes, a state institution; that, by the Constitution and laws of the Commonwealth, every denomination of Christians shall be equally under the protection of the law;

and that no subordination of any one sect or denomination to another shall ever be established by law ; and the complainants " submit that it would be highly inconsistent with, and manifestly repugnant to, the first duties of a college so constituted, and established in a state tolerating entire freedom of religious opinion and practice, to set up and maintain a school of theological instruction, designedly and directly opposed to the aforesaid policy of the State, by teaching exclusively such system of theology, and such peculiar views of the Christian religion, as are adopted and maintained by any peculiar sect or denomination of Christians, in opposition to the systems and views of other Christian sects and denominations." 2d. That, as the whole community are divided into sects, the professors and instructors must be attached to some sect, and that the intent and purposes of the donors would exclude teachers holding the tenets of many of the various sects of Christians in this commonwealth ; that few persons, other than Unitarians, are found willing or desirous to avail themselves of the advantages of the divinity school; that the establishment and maintenance, in connection with the college, of such theological school, gives to the college, notwithstanding every effort on the part of the complainants to the contrary, the name and appearance of a sectarian and Unitarian college, whereby great prejudice against the college as a suitable place for the general education of youth has been and is created among those sects of Christians whose views and sentiments are opposed to the views and sentiments of Unitarians, whereby the general usefulness of the college to the public is seriously impaired, and its number of students diminished. 3d. That the divinity school, from not being managed avowedly and designedly as a school for instruction in conformity to the Unitarian system, is less resorted to, and less flourishing, than it might be, and would be, if it assumed a more marked distinctive and sectarian character than the present trustees deem it their duty to permit.

In respect to the point first stated, that the relation of the college to the State, and the great principle of equal rights of all religious sects, recognized by our constitution, render it inexpe-

dient that a divinity school be established and maintained in connection with the college; it cannot escape our observation that it presents no newly intervening cause for the exercise of the powers of this court. It rests upon an objection existing in full force in 1818 and 1824. It is an objection as apparent then as now. Nevertheless, the president and fellows of the college, with the concurrence of the board of overseers, a majority of whom were individuals who were *ex officio* members, being such from holding high state offices, did deem it proper to establish the divinity school as a branch of the university, and they and their successors have so continued the same to the present time.

So far as any conditions for administering these funds were prescribed by the founders of the divinity school, or those who made the large donations of 1816 and of 1824, they were certainly broad and liberal, and open to all to enjoy their benefit, irrespective of sect. They were to be applied " to assist young men of competent talents, pure morals and piety in preparing themselves for the Christian ministry, and to provide for the best means of instruction which the funds of the society will admit, it being understood that every encouragement be given to the serious, impartial, and unbiassed investigation of Christian truth, and that no assent to the peculiarities of any denomination of Christians be required either of the instructors or students." And it is in accordance with this provision, as recognized and enforced in the statutes and ordinances of the college, that the divinity school has been, and now is, administered.

2. A further ground stated in the bill is, that the general usefulness of the college is impaired by the prejudice excited against it as being a sectarian college, on account of the divinity school attached to it. But the complainants aver that there is no foundation · for such charge against the college, and that its officers and instructors are not justly obnoxious to the imputation of making the college a sectarian university, and that it is not such.

How far the ground of an unfounded prejudice against the college can be made the basis for the action of this court in

withdrawing a trust from those to whom it was committed by the donors, and placing it in the hands of another and inde-pendent board of trustees, is certainly a matter for grave consideration before acting upon it. As an original question of the expediency of establishing a theological school in connection with the college, the probability of such prejudice being created thereby, injurious to the college as a place of general education, might have been properly urged, and might have induced the government of the college to decline any coöperation for the purpose of establishing such a school. What might at that period have been expedient is not the question we are now called upon to consider. We are dealing with an existing establishment, one that has been maintained more than a third of a century; and it must be quite obvious that what would well have justified the refusal to establish the divinity school originally may be quite insufficient to sever a connection sought by the government of the college, and maintained by them for so long a period, and made the object of large devises from time to time, while thus connected with the university.

As to the alleged inconveniences and embarrassments sustained by the divinity school from being under the government of the college, we perceive no new intervening cause occasioning them, that did not exist at the period of forming the union. All the reasons promising greater usefulness and success to a divinity school conducted as a separate and independent institution, and assuming a more marked and distinctive sectarian character, existed in as full force then as now. All these, we must presume, were duly weighed with the advantages that would result in giving the divinity school character and patronage from its being a branch of the university, and under the like responsible board of trustees. In the opinion of its founders and donors, the greater practical good was to be accomplished through such connection. They selected this instrumentality, and the government of the college approved of and ratified it. This being so, it is not for this court to pass upon the question of the expediency of the course taken by the donors of this charity, in originally connecting the divinity school with the college.

We have carefully considered the evidence offered by the complainants in support of the views presented by them in their bill. We have, on this subject, the statement of several witnesses of great intelligence and respectability, embracing gentlemen of various professions, and attached to various religious denominations. Amongst the witnesses are those practically conversant with the subject, from their past and present connection with the administration of the university. These statements present strongly the opinion of the witnesses that inconveniences and embarrassments do practically arise from the connection of the divinity school with the college, and that, in their opinion, a separation would be highly useful to both. Such is the general view taken of the expediency and utility of the proposed change, as shown by the testimony in the case.

That there is not an entire unanimity upon the subject among those that have been connected with the university was conceded by the counsel for the complainants; and they very frankly introduced into the case the reply of Ex-President Quincy, who presided over the university from 1829 to 1845, in answer to the inquiries propounded to him by the counsel, as to the expediency of the separation of the divinity school, as asked for in this bill, who closes an elaborate view of the whole subject by stating his opinion to be " that a continuance of their present relations to each other is best both for the divinity school and the college."

But assuming it to be shown, by the evidence in the case, that inconveniences and embarrassments do arise from having the theological school attached to the university, and under the same board of trustees; and that, in the opinion of the witnesses, it would be highly desirable, and for the interest of both, that an entire separation should take place; the further question yet remains, which the court must decide upon its own sole responsibility, whether any case is shown to exist which authorizes this court to withdraw these funds from those to whom they were committed by the donors of the charity, and transfer them to a separate and independent board of trustees, to be applied in maintaining a separate school.

In the cases to which we were referred by the counsel for the complainants, we have found no precedent nor authority for the exercise of our powers as a court of chancery to the extent we are now asked to exercise them, upon the mere proof of inconvenience, and that greater usefulness would result from giving the charity another application.

That the doctrine of the English court of chancery, as to executing the general intent of a testator *cy pres*, is much broader than any that has been adopted in the American courts generally, seems to be unquestioned. 4 Kent Com. (6th ed.) 508, *note*. 7 Ves. (Amer. ed.) 36 *b*, *note*. *Fontain* v. *Ravenel*, 17 How. 369.

But we have not deemed it material to the decision of the present case, to enter upon the consideration of that difference, inasmuch as it appears, that in the court of chancery in England the *cy pres* doctrine is inadmissible to vary the constitution of a charity on grounds of expediency only. Boyle on Charities, Bk. 2, *c*. 3, § 2, and cases cited. Upon this point, we refer to the case of *Attorney General* v. *Hartley*, 2 Jac. & Walk. 382, 383, which was an application to change a public charity. Lord Eldon said : " I observe, that many of the witnesses say, that, as a grammar school, this will be of no benefit to them. Now that is a consideration with which, if the loss of benefit is not improperly produced, I have nothing to do ; for if the founder thought fit to establish a grammar school, and if afterwards, from different notions about education prevailing, it became of much less public benefit, that is not a ground upon which a judge can alter it. He that created it had the right to determine its nature. I can give no remedy." And in *Attorney General* v. *Earl of Mansfield*, 2 Russ. 520, Lord Eldon said : " There is no power, at least none here, to alter the foundation, with a view to any superior benefit which might arise from an institution of a different nature, however desirable it might be, if it were within the scope of my authority, to substitute the one for the other."

The case before us does not present, as a ground for our interposition, that there are not present trustees to discharge this

trust. The complainants fully admit, that, having accepted the trusts, they must continue to administer them, unless discharged by this court. Nothing appears in the case to show that the public charity cannot be literally executed, agreeably to the expressed intention of the donors, although its execution may be attended with less beneficial results than if its donors had given it a different direction.

Looking at the origin of these funds, we find a large portion of them manifestly designed for the purpose of promoting theological education at Harvard College, and by a school, to be a branch of the university. We find these funds, to a large extent, so specifically placed by their donors under the trust and supervision of the government of the college, that they must be administered by them. We find strong reasons for believing that the donors had specially in view the placing these funds under the care and supervision of a well known permanent public body, the President and Fellows of Harvard College, acting with the concurrence of a distinct board of overseers, and that they were well authorized in the expectation that these trusts would be continued in the same board of trustees.

With regard to this portion of the charity funds, the granting of the prayer of this bill would not only change the trustees, but would also vary the constitution of the charity; and charity funds, given for a specific and well defined purpose connected with the university, would be applied elsewhere, and to a divinity school wholly disconnected with the college.

These remarks are applicable to that portion of these funds acquired in 1816, in response to the circular of the government of the college, of December 1815. As to this class of funds, in the provisional arrangement of 1824, making certain stipulations as to the right to apply to a separate divinity school the funds that might be raised through the efforts of the Society for Promoting Theological Education, after 1824, they were treated and apparently understood by all parties, as funds not in any event to be withdrawn, but to be devoted to theological instruction in Harvard College. Thus it will be seen, that, while the origin of this part of the funds, and all the circumstances

connected therewith, were fresh in the minds of the parties concerned, and when they contemplated the possibility of a separate divinity school being established, yet these funds were recognized as funds not to be withdrawn and applied to a separate school. The view we have above taken applies very obviously to the donation of Samuel Parkman, made in 1815; to that of George Partridge, in 1829; that of Eliphalet Porter, in 1834; that of Sarah Jackson in 1835; that of John Foster, in 1840; and that of Benjamin Bussey, in 1842; the terms of which donations have been heretofore referred to.

In regard to that of Mr. Parkman, it will be seen from its date, that it was given before the movement made to raise funds for the more enlarged divinity school. It had, as is expressed in the gift, the precise purpose " to support a professor of theology at the said college."

In regard to the other donations above named, it is no less apparent, from the terms of the bequests or donations, that they were given to the exclusive trust of the government of Harvard College, and for the purpose of perpetuating a department at the college for the promotion of theological science as a branch of university education; and it is further to be remarked, that they were all made after the year 1827, and after the vote of the president and fellows, accepting a report of their committee declaring that the theological institution " ought not to be committed to another corporation, having a distinct legal existence independent of the college," and " that the college government cannot with propriety alienate one of the chief departments of the institution committed to their care, and that to do so in this case would defeat the declared object of the contributors to the theological fund, which was to promote theological education in Harvard University." See vote of President and Fellows of Harvard College, May 24th 1827.

As to the purposes of these donors, there can be no doubt. The government of the college have accepted the trust under the circumstances stated; and, in respect to most of these donations, have long been in the administration of them in the precise manner prescribed by the donors. No legal impediment

exists to their continuing in the execution of the trust, according to the literal intent of the donors.

No case is shown to exist for the application of the doctrine of *cy pres;* for that is to be applied in giving a new direction to a charity, only when it becomes necessary to do so to prevent the charity failing, because it cannot be applied agreeably to the literal intention of the donor.

We have not overlooked the suggestion of the complainants' counsel, that, as to those donations of the marked character we have alluded to, the court might avoid the objections taken to their withdrawal, by directing them to remain under the trust of the complainants, as to the financial care, but with authority to pay over the income to the trustees of a separate school, to be by them disbursed. We find no authority for adopting such a scheme for these charities, finding the trust to embrace the higher duty of supervision of the administration of these funds, and the mode of their application; and the purpose of the donors being such as we have stated.

In view of all the facts before us, the court are of opinion that they cannot, in the proper exercise of any chancery powers they possess, direct the withdrawal of the funds above described, and others of like character, from the supervision and trust of that permanent public corporate body, to which they were intrusted by their donors for the purpose of maintaining a theological school as a branch of the university, and commit them to an independent board of trustees, to be appropriated to maintaining a separate theological school. We feel constrained, therefore, to deny the prayer of the complainants for a change in the trust in relation to this public charity.

A contrary decision would furnish a precedent dangerous to the perpetuity and sacredness of all our great public charities, leaving the question of the management and supervision of our public charities to be the subject of change with every fluctuation of popular opinion as to what may be the more expedient and useful mode of administering them. *Bill dismissed.*