|        |     |
|--------|-----|
| 76     | 471 |
| 110    | 90  |
| 76     | 471 |
| 113    | 80  |

HENRY C. PENNY, ADMINISTRATOR, ETC., V. JEROME CROUL ET AL., AND ANDREW HURLBUT ET AL. V. HENRY C. PENNY, ADMINISTRATOR, ETC., ET AL. (CROSS-BILL).

*Municipal corporations—Will—Beneficiaries—Perpetuities.*

1. The board of water commissioners of the city of Detroit, who are expressly authorized to take, by purchase or otherwise, such real and personal property as are "convenient," as well as necessary, may accept donations for the purpose of enabling them to improve and beautify the land in their custody about their works, and to maintain a library composed of works of *practical* utility to the persons engaged in looking after the works, and such as would properly be found in any such concern as part of their apparatus.

2. The following propositions are summarized from the opinion of Mr. Justice CAMPBELL:

    *a*—A bequest of personalty to be realized from real estate, which the testator directs to be sold, does not come within the statute which applies to restraints on alienation of real estate.

*b*—We have no statutes bearing on trusts in personalty, and, so far as such trusts are concerned, they must be treated as they are by their nature required to be treated by other than statutory rules.

*c*—A perfectly defined trust will not fail for lack of a trustee, but a court of equity, by its general inherent jurisdiction over trusts, can supply one.

*d*—Where a municipal corporation has within its control, for present and future use, a tract of land for municipal purposes, it would be contrary to good sense to hold that, so far as it can reasonably be done, such tract should not be put and kept in neat and attractive order.

*e*—Where a *fixed* limit is fixed by law to the amount which a corporation may hold, there are some cases, but not many, which hold a bequest beyond the limit void for the excess, but no more. The better doctrine seems to be that no one but the State can raise such a question.

*f*—The rule that prevents personal property from being tied up for more than lives in being, and 21 years thereafter, is not a universal rule of common law, but one worked out by courts of equity, and it never had any application to charitable or public benefactions.

*g*—There has never been any incapacity to keep a fund in permanence when there is a public corporation to receive and expend the income.

*h*—All municipal corporations hold their property as trustees for the general benefit; and it has never been doubted that, when any municipality is abolished, its property and functions may be placed in such hands as it pleases the Legislature to select.[1]

Appeal from Wayne. (Hosmer, J.) Argued January 18, 1889. Decided October 18, 1889.

Bill and cross-bill filed to determine validity of trust provisions of a will. Decree dismissing bills affirmed. The facts, and points of counsel *passed* upon by the Court, are stated in the opinion.

*William H. Wells,* for complainant.

*F. A. Baker,* for defendants Board of Water Commissioners, and counsel for executor and trustees.

---

[1]See *City of Grand Rapids v. Grand Rapids Hydraulic Co.,* 66 Mich. 606 (head-notes 6, 7).

*Cutcheon, Stellwagen & Fleming,* for defendants Croul *et al.,* executor and trustees.

*Isaac Marston (Marston, Cowles & Jerome,* of counsel), for complainants Hurlbut *et al.,* heirs of testator.

CAMPBELL, J. The bill in each of these cases was filed to reach property bequeathed by Chauncey Hurlbut, deceased, for the benefit of the board of water commissioners of Detroit. Each set of complainants claimed an intestacy to the extent of this bequest. Penny, as administrator of Philenda Hurlbut, who was widow of the deceased, claimed her share or interest as widow, there being no issue. The heirs at law claimed as against both widow and legatees.

There are no material facts not within the same legal principles. The court below held the bequests valid, and dismissed the bills.

Chauncey Hurlbut, one of the oldest citizens of Detroit, and a man of large means, had been for between 30 and 40 years interested in the management of the water-works system of Detroit, and was for 24 years or more a member of the board of water commissioners, of which he had been president and chief manager for about 20 years. The work had been developed under his supervision, and in 1873 had been authorized by the Legislature to be located at a place then a considerable distance outside of the city limits, between Detroit and Lake St. Clair, where a suitable tract was purchased, and large works were erected, and improvements had been begun and carried on as means would permit. He had personally contributed more or less to beautifying the grounds. He had practical knowledge of hydraulics, and had gathered a library of works, which included a number of serial and encyclopedic publications on scientific and general subjects and on the arts. He had a wife, but no descendants. Complainants Andrew Hurlbut and his associates claim to be next of kin collaterally, including a brother

and sister, and children of deceased brothers and sisters. None of them resided in Michigan.

Chauncey Hurlbut died in Detroit in September, 1885, and his wife, Philenda Hurlbut, died a little more than a year thereafter, in October, 1886. By his will he gave to his wife absolutely $10,000 in cash, and his carriages, horses, and household furniture. He also gave her the entire income of his estate, real and personal, for her life. After her death he gave legacies of $1,000 each to his brothers Samuel and Francis, and his sister Adeline, if then living, and to Louisa Rogers and John Lund similar legacies. The legacy to Adeline, if then dead, was to go to her daughter Francena, if living. He also gave gold watches to two gentlemen who seem to have been named after him.

The residue of his estate, realty and personalty, he directed to be converted, so far as not already converted, into personalty, and invested, in the manner specified, in bank stock and other securities, and the income to be paid to the board of water commissioners of Detroit. This, being the bequest claimed to be invalid, requires to be described. It is as follows:

"It is my will, also, that if, at the death of my wife, there is not $50,000 of stock belonging to me, or to my estate, of the Second National Bank of Detroit, that my executors shall purchase such additional stock in that bank as shall be required to make up that amount, and add it to the stock already there, so that there shall be $50,000, or 500 shares, of it; and I direct my executors to pay the dividends on said stock, and the revenues arising therefrom, to the board of water commissioners of Detroit, or to the legal successors of that board, having charge of the water-works of Detroit, and the grounds connected therewith, each year, to be used by it or its said successors in maintaining and improving the grounds around the works at Hamtramck, and also in keeping the room for the library in good order and condition, so as to make them creditable to the city, and pleasant and agreeable to visitors. No portion of it shall be used for the ordinary maintenance of the works, but shall be used in

fencing, fountains, keeping the library room in order, and purchasing and binding the books for the library, as provided herein, to be paid for from the fund herein provided, and generally adorning and improving the grounds about them; and the said board shall, every year, report to the common council of Detroit, both the amount of money it shall have received during the year, and the manner in which it has been expended.

"I give, also, to take effect at the death of my wife, all books now or which may hereafter be added to my library, to the said board or its said successors, and the book-cases, also there, if it chooses to take them, on condition that it places them in the room on the second floor of the engine-house tower, or some other appropriate place at the water-works, and keep them as books of reference, and not allowing them to be taken out, and shall add each year to them the London Engineer, Scientific American, Appleton's Art Journal, and Appleton's Yearly Encyclopedia, properly bound, to correspond to those now in the library. The book-case and writing-desk now in my front room I give to be placed in the library at the water-works, at the same time and on the same conditions, so as to afford strangers the opportunity of writing there, if desired. I give with it, also, to be kept for the same purpose, an inkstand of novel construction, presented to me by the Hon. H. P. Baldwin.

"I direct, also, my executors to add to my library each year, and properly bound, to correspond with the volumes already there, each of the publications above named, until such time as, by the provision herein contained, the same shall pass to the board of water commissioners or its successors. *     *     *     *     *     *

"Subject to the above bequests, and for the purpose of providing that they may carefully be carried into effect, I bequeath all of the rest and residue of my estate, both real and personal, to my wife, Philenda Hurlbut, and Jerome Croul, during the life of my said wife, and at her death to Jerome Croul, James E. Pittman, and William C. Colburn, to hold the same as trustees for the above purposes, and such purposes only, with the right, and it shall be their duty, to fill any vacancy which may be caused in any way, by death or inability to act, of either of them, by the joint appointment of the survivors, which appointment shall be carefully recorded in the records of their trust created hereby."

The clauses in the will and codicil concerning the man-

ner of investment do not affect the case presented to us.

The bequest is assailed as invalid because of want of power
to carry it out, and because it is said to. create an unlawful
perpetuity. And in this connection it is insisted the trust is
not for such a purpose as brings it within the rules applicable
to a charitable fund.

It does not come within the statute which applies to
restraints on alienation of real estate, for the plain reason
that the land is directed to be sold and converted into person-
alty. We have no statutes bearing on trusts in personalty,
and, so far as such trusts are concerned, they must be treated
as they are by their nature required to be treated by other
than statutory rules. Before we can test this will by such
rules, we must consider what the trust is.

It is à trust, in the first place, which refers to a clearly
identified and defined fund or property. In the second place,
it is for the use of a defined beneficiary representing public
interests. In the third place, its existence is not subject to
the discretion of any executor, or other person, as to whether
the property shall be turned over to that use or not. And,
lastly, the purposes to be accomplished are clearly defined.
It would be difficult to find a more complete trust in any of
its features. Had no trustee been named, the rule is familiar
that a perfectly defined trust will not fail for lack of a
trustee, but that a court of equity, by its general inherent
jurisdiction over trusts, can supply one.

If the trust fails, it can only be for the supposed reason
that its purposes are not lawful. Those purposes are—

1. Maintaining, and keeping open to visitors, a reference
library, consisting of the existing library of Mr. Hurlbut,
and the continuation and completion of several serial works,
mostly of practical utility in giving information of the prog-
ress of science and the arts, and of events and discoveries.

2. The maintenance and improvement and embellishment
of the grounds, aside from the ordinary running expenses of
the water-works.

The question involved here is not whether the water commissioners could use funds raised by taxation, or other method of collection not voluntary, for the purpose of establishing or maintaining a library, or going to an indefinite extent into the work of ornamenting their premises, but whether these purposes are repugnant to their powers to such an extent as to make void any gift or bequest for such purposes. If they are incompetent to take or spend money actually given them, the form and manner of the gift would not seem to be important.

The board of water commissioners is a corporation for municipal purposes, created by the Legislature in 1853, to have exclusive charge of the water supply of Detroit, with members appointed by the city, but otherwise acting independently of the city council in its ordinary functions, in analogy to the school board and similar municipal corporations.

In 1873, this board was authorized to obtain property outside of the then city limits, between Detroit and Lake St. Clair, and laws were passed by the Legislature to secure the water from contamination by unwholesome matter thrown in above the works. The board had power to obtain property, by purchase or otherwise, and in certain cases could have it condemned, if found necessary. It could obtain any property "needful or convenient," and there were no limits imposed on its discretion, except such as may be imposed by the general rules of law. Laws of 1853, p. 180, as amended by Laws of 1873 (local) No. 359. Penalties for injuries and other violations of right were in most cases fixed by the law itself. Like all corporations, it was authorized to make needful by-laws; but, as the board had no tribunal to enforce them, such penalties, if any, as they could lay down, could only be enforced by common-law methods.

Under the statutory authority, a parcel of land was procured in the township of Hamtramck, above Detroit, con-

taining, including dry land and marsh or water, not far from 60 acres, bordering on Detroit river. Here it appears that large buildings and works have been erected, docks built, a canal and water-basins made, and not far from 8 or 10 acres used for basins and canal, and nearly as much more partially improved; leaving the remainder to be improved as means will permit, and as required by convenience, and the growth · of the city. It also appears, incidentally, that some attempt has been made to have the grounds appear decent and sightly, and that Mr. Hurlbut contributed somewhat to enable this to be done. At the time the testimony was taken, it appeared that there were about 350 miles of water-mains, then supplying 35,000 families, which consisted, according to the office estimates, of an average a trifle over 5 to a family actually supplied, besides the supply for other purposes. The average daily distribution was then over 36,000,000 gallons a day, reaching a maximum of 48,000,000.

Where a municipal corporation has within its control for present and future use, a tract of land for municipal purposes, it would be contrary to good sense to hold that, so far as it can reasonably be done, such tract should not be put and kept in neat and attractive order. The act giving the board its powers provides expressly that it may erect fountains on any public grounds of the city whereon it deems it expedient, with the consent of the council, aside from the hydrants and other works of bare utility. The necessity of securing, in advance, space enough for future exigencies, involves the occupancy of land suitable for adornment, and capable of at least temporary use for purposes of public resort. It would not be creditable to have such a space present a rough and unsightly appearance; while at the same time, without help from the city or some other source, it might be difficult to do as much as necessary to make it pleasant.

Enough appears from the record to show that the water

commissioners have sought to do something towards improving these grounds; and the fact that the city has acquiesced, and that so careful an officer as the testator has acted on the assumption that such work was proper, and has sought to make permanent provision for it, indicates to some extent how the matter strikes a plain business man who understands the situation. It would be going beyond common sense and reason to hold that the commissioners, who are expressly authorized to take, by purchase or otherwise, such real and personal property as are "convenient," as well as necessary, cannot accept donations for the purpose of enabling them to improve and beautify the land in their custody about their works. If they are, then there can be no legal objection to this trust, unless it is found in its permanence.

If authorized to take at all, there is no rule of law that can hold the bequest void as being excessive. Where a fixed limit is fixed by law to the amount which a corporation may hold, there are some cases, but not many, which hold a bequest beyond the limit void for the excess, but no more. The better doctrine seems to be that no one but the State can raise such a question. But no such limitation exists here, and no such question can arise. And, with the constantly decreasing rates of interest, it is not very clear that the income would exceed what could be expended without folly in improving the premises and keeping them in order. As the Legislature, by Local Act 539, Laws of 1887, expressly authorized the board to accept and expend this fund, it is beyond the power of this Court to say it is not proper to do so.

We can see no more reason for doubting the propriety of using so much of the fund as is necessary for the library. The additions required to be made for it are all such as would be of immediate practical utility to the persons engaged in looking after the works, and such as would properly be found in any such concern as part of their apparatus. This is

also affirmed by the legislative act in question; and had it been invalid, as we think it is not, it could not affect the validity of the trust.

We were favored with a very full argument on the subject of perpetuities, but we do not feel called on to consider that question much at length, in view of our own decisions in the *Hatheway Will Cases,* and in *Maynard v. Woodard,* 36 Mich. 423. The rule which prevents personal property from being tied up for more than lives in being, and 21 years thereafter, is not a universal rule of common law, but one worked out by courts of equity, and it never had any application to charitable or public benefactions. There has never been any incapacity to keep a fund in permanence when there is a public corporation to receive and expend the income. Even when the charity was for more vague purposes, not affecting a public corporation, there is no question but that such a fund could always be saved by the king's prerogative as *parens patriæ,* before as well as since the statute of Elizabeth, which did little, if any, more than authorize that prerogative to be exercised by the chancellor, in whom much other prerogative power had been, and continued to be, vested.

But no exercise of prerogative was needed where a competent corporation already existed. In case the objects of the trust were exhausted, the fund, instead of resulting to the donors, was subject to a new appointment by the prerogative. There can be no less power in our governments than in a royal government, except as limited by our constitutions. The Legislature, certainly, have all the royal powers not vested somewhere else, and there can be no doubt of their power by statute to do what could in England be done by the crown. We have ourselves recognized this doctrine in the Hatheway and Woodard Cases, and it is recognized by a series of decisions in the United States Supreme Court. *Vidal v. Girard's Exrs.,* 2 How. 127; *Wheeler v. Smith,* 9 Id. 55; *Ould v. Washington Hospital,* 95 U. S. 303; *Inglis v. Sailor's*

*Snug Harbor,* 3 Pet. 99; Taney's opinion in *Fontain v. Ravenel,* 17 How. 369; *McDonogh's Exrs. v. Murdoch,* 15 Id. 367; *Perin v. Carey,* 24 Id. 465; *Stanley v. Colt,* 5 Wall. 119; *Lorings v. Marsh,* 6 Id. 337; *Girard v. Philadelphia,* 7 Id. 1.

The last case cited bears upon a question, presented on the argument, as to the possibility that the water board may be abolished. All municipal corporations hold their property as trustees for the general benefit; and it has never been doubted that, when any municipality is abolished, its property and functions may be placed in such hands as it pleases the Legislature to select. Presumptively, all such bodies are capable of permanency. When their powers are made to devolve elsewhere, it is because their successors are supposed to be capable of assuming them to the public advantage. Territories become states, towns and villages are merged into cities, and cities are enlarged or changed at pleasure. It has never been supposed that such changes lead to escheats or forfeitures. Public trusts are subject to public control, and that is with the Legislature.

Whether the power vested in the trustees to select a new one, in case of vacancy, is enforcible, is not important in the present controversy, as the trust is one where an entire vacancy could be supplied by a court of equity, and where the beneficiary, being a public corporation, could act for itself.

The will does not contemplate appointments except by the original trustees named, who are all lives in being, and whose acts would not, in case of a mere private trust, go beyond the permissible limits of time in regard to personal property. But their action, or failure to act, could not affect the existence of the trust in favor of the water board.

The bill was properly dismissed as against both sets of complainants, and the decree must be affirmed, with costs.

The other Justices concurred.