## HOADLY v. CHASE.

### (Circuit Court, D. Indiana. January 18, 1904.)

#### No. 10,194.

1. FEDERAL COURTS — JURISDICTION — INSANE PERSONS — CUSTODY — PARENS PATRIÆ.

　The federal courts have no jurisdiction to exercise the function of parens patriæ for the determination of the right to the custody of an insane person.

2. SAME—STATE COURTS—JURISDICTION—HABEAS CORPUS—PENDING PROCEEDINGS.

　Where a proceeding had been brought in a state court, of competent jurisdiction, between citizens of different states, to determine the sanity of an alleged insane person, and the right to custody thereof, the federal court, pending determination of such proceeding, will not review the right to the custody of such incompetent on a writ of habeas corpus alleging that he is restrained of his liberty without due process of law.

Hearing on Petition for a Writ of Habeas Corpus.

On April 25, 1903, George Hoadly, Jr., filed his petition in this court against the respondent, Frederick S. Chase, praying for the issuance of a writ of habeas corpus directed to the said Chase, requiring him to produce the body of one Moses Fowler, sometimes erroneously described, the bill alleges, as Moses Fowler Chase, and who, it is averred, is illegally restrained of his liberty by the respondent at St. Elizabeth's Hospital, in the city of Lafayette, Ind., in violation of the first section of the fourteenth amendment to the Constitution of the United States. In substance, the petition alleges the following facts: The respondent, Frederick S. Chase, is the father of Moses Fowler. Ophelia Fowler Duhme, an aunt of Moses Fowler, and sister of the respondent's deceased wife, who was the mother of Moses Fowler Chase, lived at Cincinnati, Ohio, from the year 1887 to the present time. In 1889 the respondent was appointed by the Tippecanoe circuit court, of the state of Indiana, guardian of his son, then 11 years of age, and continued in such trust during the boy's minority. In 1887, with the knowledge and consent of respondent, the boy went with his aunt to her home in Ohio; and while

making his home there with Mrs. Duhme, in the summer of 1898, he became insane, the result of a sunstroke, and was committed to a sanitarium at Flint, Mich., he having been shortly prior thereto adjudged by a Michigan court a person of unsound mind. The boy became of age on June 4, 1899, and about that time the respondent went to Flint, took the boy as far as Detroit, intending to take him to respondent's home, at Lafayette, Ind.; but at Detroit the lad there met his aunt, and went with her to Cincinnati, where, on June 13, 1899, the boy was by the probate court of Hamilton county, Ohio, adjudged a person of sound mind, and an inhabitant of Hamilton county, Ohio. On November 21, 1899, on proceedings instituted by one Samuel P. Baird, the boy was adjudged a person of sound mind by the circuit court of Tippecanoe county, Ind. In the spring of 1900 the boy presented his verified petition to the probate court of Hamilton county, Ohio, and, upon consideration thereof, his name was changed from Moses Fowler Chase to Moses Fowler. Shortly thereafter the boy accompanied his aunt and uncle to Europe, and there suffered a relapse, and was placed in two different sanitariums in Paris, France. The petition then alleges that on March 25, 1903, when the boy was fully restored to health, and in full possession of his mental faculties, the respondent, by his agents and servants, forcibly took the boy from the sanitarium near Paris where he was sojourning, brought him to America, and to the city of Lafayette, Ind., where the respondent has since kept the boy in confinement, and restrained of his liberty; that, by reason of the violence used and terror occasioned by the forcible taking and confinement of said Fowler by the respondent, the malady returned, and at this time said Fowler is a person of unsound mind. On April 16, 1903, the respondent filed his petition in the circuit court of Tippecanoe county, Ind., praying that Moses Fowler Chase be declared of unsound mind, and that a guardian be appointed of his person and property. The summons was read to the said Moses Fowler Chase by the sheriff on that day, which summons was made returnable April 27, 1903. It is charged in the petition that the Tippecanoe circuit court had no jurisdiction, because the boy was not an inhabitant of Tippecanoe county, Ind., within the meaning of the Indiana statutes, and because the boy was, in fact and in law, an inhabitant of Hamilton county, Ohio. On April 25, 1903, two days before the summons was returnable in the case commenced in the Tippecanoe circuit court, Mrs. Ophelia Fowler Duhme, the boy's aunt, filed her petition in the probate court of Hamilton county, Ohio, for the appointment of a guardian by that court of the person and estate of the said Moses Fowler, on the ground of insanity, and because the said Moses Fowler was a citizen and resident of the county of Hamilton, Ohio. On the same day the petition was filed, it was considered by that court, and the prayer of the petition was granted by the appointment of George Hoadly, Jr., one of Mrs. Duhme's attorneys, as guardian of the said Moses Fowler. On the afternoon of the same day the said George Hoadly, Jr., filed in this court his petition for the writ of habeas corpus. The petition prays that the respondent, Frederick S. Chase, be required by the writ to produce in this court the body of said Moses Fowler, then and there to abide the orders and judgment of this court; that upon such hearing the said Moses Fowler be restored to his liberty, and the respondent restrained from interfering with or attempting to deprive him of his liberty, contrary to the provisions of the fourteenth amendment to the Constitution of the United States. On the filing of the petition in this court the respondent appeared by his counsel, and resisted the petition for want of jurisdiction in this court to award the writ upon the facts averred in the petition.

W. A. Ketcham, Kumler & Gaylord, Haywood & Burnett, Kittridge & Wilby, and Harmon, Colston, Goldsmith & Hoadly, for petitioner.

Stuart, Hammond & Sims, Hanley & Wood, and A. C. Harris, for respondent.

ANDERSON, District Judge (orally). There are several reasons why this court has no power or authority to issue this writ, and there

are several reasons why I shall refuse to issue it. It was stated by counsel for the petitioner in their argument that if the question here were similar to the question in the case of In re Burrus, 136 U. S. 586, 10 Sup. Ct. 850, 34 L. Ed. 1500—that is, if this court is asked now to exercise the function of parens patriæ—then this court has no jurisdiction. If I have misunderstood counsel, they have the opportunity now to correct me. I understood Mr. Ketcham to state clearly that if this petition asked the exercise of the function of parens patriæ; invoked that jurisdiction which the sovereign formerly possessed, and which now resides, the authorities show, in the states; if the question before us involved that peculiar jurisdiction—then this court has no jurisdiction to issue this writ. I think that the proposition is sound; that, if the question now before us belongs to that jurisdiction, then this court has no jurisdiction. Blackstone, in his Commentaries, speaks of infants, idiots, and lunatics, and charities, as being under the care and charge of the crown, as parens patriæ. In the Matter of Dowdell, Petitioner, 169 Mass. 387, 47 N. E. 1033, 61 Am. St. Rep. 290, on page 389, 169 Mass., page 1034, 47 N. E., 61 Am. St. Rep. 290, the court uses this language:

"The Legislature, as parens patriæ, may, to some extent, make provision for the care of those who are unable to take proper care of themselves, as in the case of insane persons and neglected children."

In Mormon Church v. United States, 136 U. S. 1, 10 Sup. Ct. 792, 34 L. Ed. 481, in the syllabus, it is stated:

"In this country the Legislature has the power of parens patriæ in reference to infants, idiots, lunatics, charities, etc., which in England is exercised by the crown."

In the opinion itself the court says:

"Lord Chancellor Somers, in Cary v. Bertie, 2 Vernon, 333, 342, said: 'It is true, infants are always favored. In this court there are several things which belong to the King, as pater patriæ, and fall under the care and direction of this court, as charities, infants, idiots, lunatics, etc.'"

And again in the same opinion the court said:

"In Fontain v. Ravenel, 17 How. 369, 384 [15 L. Ed. 80, 86], Mr. Justice McLean, delivering the opinion of this court in a charity case, said: 'When this country achieved its independence, the prerogatives of the crown devolved upon the people of the states. And this power still remains with them, except so far as they have delegated a portion of it to the federal government. The sovereign will is made known to us by legislative enactment. The state, as a sovereign, is the parens patriæ.'"

The court further says:

"This prerogative of parens patriæ is inherent in the supreme power of every state, whether that power is lodged in a royal person or in the Legislature, and has no affinity to those arbitrary powers which are sometimes exerted by irresponsible monarchs to the great detriment of the people and the destruction of their liberties. On the contrary, it is a most beneficent function, and often necessary to be exercised in the interests of humanity, and for the prevention of injury to those who cannot protect themselves."

In that case, arising as it did in the territory, as it then was, of Utah, the Supreme Court held that the national government had this power of parens patriæ in the territory of Utah; that this power,

resident in the states ordinarily, resided in the national government, so far as the territories of the United States are concerned.

In the case of Fontain v. Ravenel, 17 How. 369, 15 L. Ed. 80, Chief Justice Taney, in a concurring opinion, says:

"Blackstone, in his Commentaries (3d vol., 47), enumerating what he states to be the extraordinary powers of the Chancellor, says: 'He is the general guardian of all infants, idiots, and lunatics, and has the general superintendence of all charitable uses in the kingdom; and all this over and above the vast and extensive jurisdiction which he exercises in his judicial capacity in the court of chancery.' * * * So, too, Cooper, in his chapter on the jurisdiction of the court, says: 'The jurisdiction, however, in the three cases of infants, idiots, or lunatics and charities, does not belong to the court of chancery as a court of equity, but as administering the prerogative and duties of the crown.' * * * The second section of the third article of the Constitution declares that the judicial power of the United States shall extend to all cases in law and equity specified in the section. These words obviously confer judicial power, and nothing more, and cannot, upon any fair construction, be held to embrace the prerogative powers, which the King, as parens patriæ, in England, exercised through the courts. And the chancery jurisdiction of the courts of the United States, as granted by the Constitution, extends only to cases over which the court of chancery had jurisdiction in its judicial character as a court of equity. The wide discretionary power which the Chancellor of England exercised over infants, lunatics, or idiots, or charities, has not been conferred. These prerogative powers, which belong to the sovereign, as parens patriæ, remain with the states."

So it seems that in the case at bar there is involved a peculiar jurisdiction, which remains in the states, and is not conferred upon the courts of the United States at all. And in the case of King v. The McLean Asylum of Massachusetts General Hospital, 64 Fed. 325, 12 C. C. A. 139, 26 L. R. A. 784, relied upon by petitioner, Judge Putnam uses this language on page 351, 64 Fed., page 165, 12 C. C. A., 26 L. R. A. 784:

"Whatever a state tribunal, having jurisdiction as parens patriæ, might accomplish, especially in Massachusetts, where the statute authority given to judges of the higher courts touching the committing of insane persons to asylums would cover the case of a prior informal committal, and enable them to apply an immediate and practical remedy by a new one, the Circuit Courts [meaning the Circuit Courts of the United States] have not the machinery to deal suitably with a person in the condition in which the petitioner is alleged in this return to be, and would therefore be prohibited, both by public policy and humanity, from merely discharging him from the custody in which he might be found. In such circumstances a court would be called on to exercise more than ordinary judicial powers, including those possessed by the Chancellor, as representative of the sovereign, or by virtue of his sign manual."

This is the case, as I understand it, that petitioner relies upon.

It is said by one of the counsel for petitioner that they do not want this court to take this unfortunate person from the custody of his father, and give him in custody to the guardian appointed in Cincinnati. It is said by another of counsel for petitioner that they do expect this court, if it should find the facts upon the hearing to be as they claim, instead of turning him loose on the world, to turn him over to the guardian appointed in Cincinnati.

It has been urged with a great deal of earnestness, with reference to the "great writ of habeas corpus," that the question here is one of personal liberty. Now, that does well enough for counsel, but surely

the court cannot shut its eyes to what it knows to be the fact. There is no question of liberty involved here. We all know that this young man was not free in France. The petition alleges that only at times was he able to leave the sanitarium in France, and only at times was he able to be out, except in the care of an attendant. The petition alleges, it is true, with a good deal of rhetoric, the manner in which, he was brought from there here. There is no charge in the petition, however, that the father, in whose custody he now is, is doing anything except merely to hold him—merely to keep possession of him. There is no question of personal liberty involved in this matter at all, in my judgment.

Judge Putnam, in the case relied upon by petitioner, said that the United States courts would not pass upon the question as to who should have the custody of King. Yet this court is asked to take this insane person out of the hands of the person in whose custody he now is, and either turn him loose in the world—which counsel who last occupied the floor for the petitioner disclaimed—or put him in the possession of another person; and that, as I understand it, is asking this court to pass upon the question as to who shall have possession of this insane person, and to exercise that discretion which Judge Putnam expressly disclaimed the power of the United States courts to do, in the case relied upon by petitioner.

In the petition it is alleged, with respect to the proceeding commenced and now pending in the Tippecanoe circuit court, that the only notice that was served on this unfortunate person was the summons which is set out in the petition. What further notice could have been served, counsel for the petitioner have not stated, and this court does not know.

Now, in the last two months this court has heard a great deal of argument upon the jurisdictions—the different jurisdictions—of the state and federal courts; and the court has had occasion to decide some important questions, and to take some pronounced grounds upon the cases as presented. In this case the petition shows that on the 16th day of April, 1903, a petition was filed in the Tippecanoe circuit court—a court which has jurisdiction of the subject-matter—alleging that Moses Fowler Chase was an inhabitant of the county of Tippecanoe, and that he was a person of unsound mind. That case is still pending. The Tippecanoe circuit court has the right and the power to decide both of those questions; and to ask this court now, right upon the eve of that hearing, as was done last Saturday night, and as is done now by reason of the postponement of the hearing in the state court until to-morrow—to ask this court now to issue this writ under the circumstances is equivalent to asking it to decide in advance that the state court, which has full, complete, and exclusive jurisdiction to try those questions and decide them, will decide wrong. The Tippecanoe circuit court, upon the face of this petition, has jurisdiction of the subject-matter—not only of the subject-matter, in the sense that it has jurisdiction of that sort of questions, but it has jurisdiction of this case; it has jurisdiction of the person whose sanity is in question; and, if this proceeding had not been brought, that question would have been already determined by the Tippecanoe circuit

court, and, as this court is bound to conclude, would have been properly determined. I do not think that this court now, after that proceeding has been begun in the Tippecanoe circuit court—after summons has been issued and served, and a day set for the hearing—has any right to interfere with that jurisdiction.

The only claim that is made that gives this court any appearance of jurisdiction is the claim that grows out of diverse citizenship. To my mind, the case of Kurtz v. Moffitt, 115 U. S. 487, 6 Sup. Ct. 148, 29 L. Ed. 458, is conclusive of the question here. It is well enough to read the statutes and the Constitution, which in general terms speak of the powers and jurisdiction of the United States courts, but, after all, these courts have no jurisdiction except that which is distinctly given. And in reference to diverse citizenship, in every section, in every clause, conferring jurisdiction because of diverse citizenship, there is included the element of the amount in controversy. Counsel for petitioner have not pointed out any exception to this. If it be true that a habeas corpus proceeding brought in a state court, where the defendant is a nonresident of that state, cannot be removed to the United States court, because, although being between citizens of different states, the controversy does not involve $2,000, exclusive of interest and costs, the conclusion seems irresistible that this court is without original jurisdiction. See, also, Cross v. Burke, 146 U. S. 82, 87, 88, 13 Sup. Ct. 22, 36 L. Ed. 896.

The petition for the writ is denied.