# The Musical Fund Society of Philadelphia

*W. Wesley Nagle*, *William E. Zeiter*, *Lawrence H. Berger* and *Morgan, Lewis & Bockius*, for petitioner.

*Philip A. Bregy* and *MacCoy, Evans & Lewis*, for respondent.

KLEIN, *A. J.*, November 24, 1975—Meyer L. Casman, a respected member of the Philadelphia bar for many years, is a member of the Musical Fund Society of Philadelphia (hereafter referred to as the "society").

On March 27, 1974, pursuant to a petition filed by Mr. Casman, this court ordered a citation to be issued directed to the officers and directors of the society to show cause why "they should not file an account covering the activities of the society from 1963 to the present date." In his petition, a copy of which was sent to the Attorney General of Pennsylvania in his capacity as parens patriae, Mr. Casman stated, inter alia:

"2. The Society is a nonprofit corporation originally chartered by the Pennsylvania Legislature by the Act of February 22, 1823, P.L. 47, with its purpose stated to be 'the relief of decayed musicians and their families, and the cultivation of skill and diffusion of taste in music.'

"3. The original charter was supplemented and amended by the Pennsylvania Legislature by the Act of April 28, 1857, P.L. 344, so as to grant The Society 'the power to confer academic degrees in music' and 'the power to establish such schools for the cultivation of skill and of taste in music, both vocal and instrumental, as the managers may

deem to be most efficient for these purposes.' The Act of 1857 was stated to amend the original charter only insofar as the supplementary charter was inconsistent with the original.

"4. Pursuant to the terms of the original charter, membership in The Society is divided into two categories, professional (or professors) and amateur. Only professional members of three years' standing are eligible for 'decayed musician' relief from The Society's funds.

"5. The number of 'professional' members of The Society has steadily declined since 1938 when the last 'professional' member was admitted. This attrition is intentional since it has been the custom since 1938 to accept all new members in a class of membership other than 'professional,' even though they may be, in fact, professional musicians. Only one person remains in the 'professional' category.

"6. Whereas in its early years The Society even borrowed money to maintain aid to its beneficiaries and dropped concerts when they threatened to jeopardize relief payments, the practice since 1938 has been to favor expenditures for free public concerts and social affairs of the members, with expenditures for 'decayed musicians and their families' declining, so that only four were benefited in 1970.

"7. Your Petitioner has made repeated efforts to bring to the attention of The Society's officers and directors his concern over The Society's planned obsolescence of the professional membership category and inevitable effect of such obsolescence on the ability of The Society to carry out its primary stated purpose.

"8. Your Petitioner has corresponded with the Attorney General of Pennsylvania relating to the refusal of the officers and directors of The Society to

carry out its primary charitable purpose. In the course of this correspondence, the Attorney General has recommended that your Petitioner and other concerned members of The Society initiate an appropriate action to enforce the stated charitable purpose.

"9. Your Petitioner is requesting the filing of an Account by the officers and directors of The Society for the period 1963 to the present so as to give an accurate picture of The Society's activities in recent years. In conjunction with the audit of such Account, your Petitioner intends to challenge the actions of the officers and directors of The Society in refusing to carry out the first of the stated purposes of The Society, relief to musicians and their families.

"10. It is your Petitioner's understanding that the funds held by The Society have a current value of approximately $500,000, having been derived in part from legacies to The Society and in part from inter vivos gifts."

On April 24, 1972, the society filed "Preliminary Objections Raising Questions of Law to Petition for an Accounting" in which it stated:

"1. The principal allegations of the petition are:

"That the purposes of The Society as set forth in its charter are (1) the relief of decayed musicians and their families, (2) the cultivation of skill in music, and (3) the diffusion of taste in music;

"That no 'professional' members, who would be qualified to receive pensions under the first of the enumerated purposes, have been admitted since 1938;

"That this 'attrition' in the professional membership was intentional; and

"That The Society should be directed to file an Account so as to give this petitioner the opportunity to 'challenge the actions of the officers and directors of The Society in refusing to carry out the first of the stated purposes of The Society, relief to musicians and their families.'

"2. The petition does not allege The Society has diverted its fund from the charitable purposes for which it was incorporated but merely that it is decreasing its activities in one of its three purposes.

"3. So long as a charitable corporation does not act ultra vires, there is no requirement in the law that it must engage in activities related to all of the purposes set forth in the charter."

The matter came on for argument before the court en banc at which time it was conceded by counsel for all parties in interest that the Orphans' Court Division was without authority to pass upon questions dealing with the internal management of a nonprofit charitable corporation. The court was informed by counsel that the Supreme Court was giving consideration to modification of the Rules of Judicial Administration to extend the jurisdiction of the Orphans' Court Division to include situations such as were involved in the present proceedings. The argument was, therefore, continued generally to await the action of the Supreme Court.

On April 11, 1975, the Pennsylvania Supreme Court, upon recommendation of the Judicial Council, pursuant to its authority under article V, sec. 10(c) of the Pennsylvania Constitution, adopted and promulgated a new Pennsylvania Rule of Judicial Administration No. 2156, which extended broadly the jurisdiction of the Orphans' Court Division with respect to the supervision of nonprofit

charitable corporations. The matter was then placed on the October 1975 argument list for reargument.

In Pennsylvania Home Teaching Society, 15 Fiduc. Rep. 556 (1975), Administrative Judge Klein reviewed and discussed at considerable length the history of the jurisdiction of the Orphans' Court Divison over charitable corporations. We will not repeat here what was stated in that adjudication, except to say that we agree with the conclusion that under Rule 2156 jurisdiction over the administration and application of property held or controlled by nonprofit corporations for charitable purposes has been transferred to the Orphans' Court Division of the Common Pleas Court.

We, therefore, conclude that this court has jurisdiction over the internal affairs of the society, including the questions which are now before us for consideration.

We have often expressed reluctance to dispose of litigation upon preliminary objections, as experience has convinced us that the ends of justice are best served when the parties are given full opportunity to present the complete factual situation to the court: Diamandas Estate, 73 D. & C. 334 (1950); Reichert's Estate, 52 D. & C. 254 (1944); Schmitz Trust, 5 Fiduc. Rep. 440 (1955). See also Gallagher v. Merry, 366 Pa. 258 (1951); Mather Estate, 12 Fiduc. Rep. 237 (1962).

In our opinion, this rule applies with special force in the present case because the society has been operating for more than 150 years and has assets of approximately $500,000. In spite of this, there is nothing in this meager record to indicate that any governmental agency, whether Federal, State or municipal, has ever concerned itself in any manner

with the internal affairs of this nonprofit, charitable corporation.

In Pruner Estate, 390 Pa. 529, 531 (1957), Justice Cohen, speaking for a unanimous Supreme Court, said:

"The beneficiary of charitable trusts is the general public to whom the social and economic advantages of the trust accrue. But because the public is the object of the settlors' benefactions, private parties have insufficient financial interest in charitable trusts to oversee their enforcement. Consequently, the Commonwealth itself must perform this function if charitable trusts are to be properly supervised. The responsibility for public supervision traditionally has been delegated to the attorney general to be performed as an exercise of his Parens Patriae powers. See Commonwealth ex rel. Minerd v. Margiotti, 325 Pa. 17, 23, 188 Atl. 524 (1936). These are the ancient powers of guardianship over persons under disability and of protectorship of the public interest which originally where held by the Crown of England as the 'father of the country,' 3 Blackstone, Commentaries 47; Fontain v. Ravenel, 58 U. S. (17 How.) 369 (1855), and which as part of the common law devolved upon the states and federal government. Fontain v. Ravenel, supra. Specifically, these powers permitted the sovereign, wherever necessary, to see to the proper establishment of charities through his officer, the attorney general, and to exercise supervisory jurisdiction over all charitable trusts. 3 Blackstone, Commentaries 427."

In a landmark decision: Commonwealth v. The Barnes Foundation, 398 Pa. 458, 467 (1960), Justice Musmanno said:

"This Court has affirmed the common law in holding that where litigation involves charitable trusts, the Attorney General is obliged to participate as a necessary party. (Garrison Estate, 391 Pa. 234). It would be an inadequate form of government which would allow organizations to declare themselves charitable trusts without requiring them to submit to supervision and inspection. Without such supervision and control, trustees of alleged public charities could engage in business for profit. It is because of the temptation which such lack of supervision would offer, that a Congressional committee observed: 'Foundations should not only operate in a goldfish bowl, they should operate with glass pockets.' (H.R. Report 2514, 82d Congress.)."

In Pruner's Estate, supra, the court in a footnote, page 531, said: ". . . This lack of private control over the administration of charitable trusts has given rise to serious problems of neglect, inaction and abuse which has aroused much attention in recent years both in the United States and England . . ."

Much has been written with the hope that remedial measures would be inaugurated, but with little success. For two interesting articles on the subject see: "State Supervision of Charities," 52 Michigan L. Rev. 633 (1954) by the eminent Professor Bogert, and "Disclosure Laws for Charitable Funds," 105 U. of Pa. L. Rev. 1044 (1957), by our learned colleague, Judge Lois Forer. See also 21 Univ. Chi. L. Rev. 118 (1953); 27 Bost. Univ. L. Rev. 342 (1947); 47 Col. L. Rev. 659 (1947); 84 Trusts & Estates 345 (1947); 23 Ind. L.J. 141 (1948).

In view of the extremely large sums of money controlled by charitable nonprofit corporations in

this State, we respectfully suggest to the Legislature and the Attorney General that a comprehensive study of the entire question of thorough and meaningful supervision of such corporations has too long been neglected and should receive their prompt attention.

Although it is clear that the Attorney General, as parens patriae, has broad visitorial and supervisory powers over charitable funds and is primarily responsible for making certain that such funds are properly administered, the courts, to a degree, also exercise the same visitorial and supervisory powers: Toner's Estate, 260 Pa. 49 (1918); Lehigh Univ. v. Hower, 159 Pa. Superior Ct. 84 (1946).

We think it is our duty to obtain more information concerning this charitable corporation which has been functioning for more than a century and a half, apparently without any inspection or supervision by government. We would like to know, for example, whether the board of directors is self-perpetrating, what the costs of administering the corporation are, exactly to what uses the corporation income is being applied, how much money is being spent for "social affairs of the members" and other pertinent information concerning the society's management.

In the present case, although the Attorney General has received notice of these proceedings, he has not entered his appearance and has, instead, recommended that Mr. Casman, the petitioner, and other concerned members of the society initiate appropriate action to enforce the stated charitable purposes. Although we fully realize that the Attorney General's staff is undermanned and overworked and that he does not have sufficient personnel to properly fulfill his responsibilities as

parens patriae, nevertheless we believe that, in cases such as the one before us, he cannot avoid his responsibilities and delegate them to the membership of the charity. Accordingly, we direct the Attorney General to assign an assistant to this case with instructions to enter his appearance for the Commonwealth and take such action as he considers necessary to make certain that the officers and directors of the society are properly administering the affairs of this nonprofit charitable corporation.

Without in any manner attempting to prejudge the relative merits of the contentions of the respective parties to these proceedings, we enter the following

## DECREE

And now, November 24, 1975, the preliminary objections filed by the Musical Fund Society of Philadelphia are dismissed pro forma with leave to file an answer to the merits within 60 days of the date of this decree.